[850 NE2d 653, 817 NYS2d 606]

FUNDAMENTAL PORTFOLIO ADVISORS, INC., et al., Appellants, v
TOCQUEVILLE ASSET MANAGEMENT, L.P., et al., Respondents.

Argued May 3, 2006; decided June 6, 2006

## POINTS OF COUNSEL

*Folkenflik & McGerity,* New York City (*Max Folkenflik* of counsel), for appellants. I. The Appellate Division majority decision misapplied the law in finding "waiver" of the noncompete agreement. (*General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist.,* 85 NY2d 232; *Alsens Am. Portland Cement Works v Degnon Contr. Co.,* 222 NY 34; *Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.,* 61 NY2d 442; *Gilbert Frank Corp. v Federal Ins. Co.,* 70 NY2d 966; *Excel Graphics Tech. v CFG/AGSCB 75 Ninth Ave.,* 1 AD3d 65, 2 NY3d 794; *Cobble Hill Nursing Home v Henry & Warren Corp.,* 74 NY2d 475; *Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.,* 93 NY2d 584; *Imperator Realty Co. v Tull,* 228 NY 447; *Arnot v Union Salt Co.,* 186 NY 501; *Toplitz v Bauer,* 161 NY 325.) II. There is no basis for finding estoppel where there was no misrepresentation and plaintiffs-appellants only refused to conclude an agreement when defendants-respondents refused to pay. (*Triple Cities Constr. Co. v Maryland Cas. Co.,* 4 NY2d 443; *Lynn v Lynn,* 302 NY 193; *Metropolitan Life Ins. Co. v Childs Co.,* 230 NY 285; *White v La Due & Fitch, Inc.,* 303 NY 122; *Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175; *Michaels v Travelers Indem. Co.,* 257 AD2d 828; *Matter of E.F.S. Ventures Corp. v Foster,* 71 NY2d 359; *Byrne v Barrett,* 268 NY 199; *Wills v Investors Bankstocks Corp.,* 257 NY 451; *Metropolitan Life Ins. Co. v Childs Co.,* 230 NY 285.) III. The uncontroverted evidence in the record proves that plaintiffs-appellants would have been retained by the Fundamental Funds or sold their business absent competition from the Tocqueville defendants.

*Seward & Kissel LLP,* New York City (*Mark J. Hyland* and *Charles M. Miller* of counsel), for respondents. I. The Appellate Division properly affirmed the IAS court's order granting summary judgment dismissing the complaint and denied appellants' cross motion because there is no genuine issue of fact that appellants consented to and arranged for the Tocqueville defendants to "engage in business activity involving the funds" and therefore the 1996 agreement was not violated. (*Teitelbaum Holdings v Gold,* 48 NY2d 51; *Fiore v Fiore,* 46 NY2d 971; *Continental Wall Paper Co. v Louis Voight & Sons Co.,* 212 US 227; *Reed, Roberts Assoc. v Strauman,* 40 NY2d 303; *Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175; *Oleg*

*Cassini, Inc. v Couture Coordinates, Inc.,* 297 F Supp 821; *General Elec. Co. v National Contr. Co.,* 178 NY 369; *Bennett v North British & Mercantile Ins. Co. of London & Edinburgh,* 81 NY 273; *Alsens Am. Portland Cement Works v Degnon Contr. Co.,* 222 NY 34; *General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist.,* 85 NY2d 232.) II. The Appellate Division properly found that appellants could not withdraw their consent after more than a year elapsed with respondents relying on it. (*Seidel v 18 E. 17th St. Owners,* 79 NY2d 735; *Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175; *Triple Cities Constr. Co. v Maryland Cas. Co.,* 4 NY2d 443; *Lynn v Lynn,* 302 NY 193; *Metropolitan Life Ins. Co. v Childs Co.,* 230 NY 285; *Holm v C.M.P. Sheet Metal,* 89 AD2d 229; *Townley v Emerson Elec. Co.,* 178 Misc 2d 740; *AIU Ins. Co. v Unicover Mgrs.,* 282 AD2d 260; *Gilbert Frank Corp. v Federal Ins. Co.,* 70 NY2d 966; *Matter of Heisler v Gingras,* 90 NY2d 682.) III. Appellants are not entitled to recover in this action for additional reasons. (*Riggs v Palmer,* 115 NY 506; *McConnell v Commonwealth Pictures Corp.,* 7 NY2d 465; *Flegenheimer v Brogan,* 284 NY 268; *Walters v Fullwood,* 675 F Supp 155; *Contemporary Mission, Inc. v Bonded Mailings, Inc.,* 671 F2d 81; *Wakeman v Wheeler & Wilson Mfg. Co.,* 101 NY 205; *Kenford Co. v County of Erie,* 67 NY2d 257, 73 NY2d 312; *Tevdorachvili v Chase Manhattan Bank,* 103 F Supp 2d 632; *W.T. Grant Co. v Srogi,* 52 NY2d 496; *Schonfeld v Hilliard,* 218 F3d 164.)

## OPINION OF THE COURT

GRAFFEO, J.

In furtherance of a proposed transfer of advisory responsibility over a group of mutual funds from plaintiffs to defendants in return for monetary compensation, the parties executed an agreement that precluded defendants from soliciting or engaging in business with the funds if the deal was not consummated. The primary issues before us in this breach of contract action are whether the record establishes—as a matter of law—that plaintiffs, by nurturing a business relationship between defendants and the funds, waived the right to enforce the noncompete agreement or should otherwise be estopped from relying on that provision. Because there are questions of fact that must be resolved before application of waiver and estoppel may be determined, we conclude that defendants are not entitled to summary judgment.

I

Beginning in the early 1980s, plaintiff Lance Brofman founded a group of five mutual funds collectively referred to as the Fundamental Funds.[1] Brofman acted as president and chief portfolio strategist of the Funds, and was also the president and principal shareholder of the Funds' investment management advisor, plaintiff Fundamental Portfolio Advisors, Inc. (FPA). Brofman's partner in this venture was Vincent Malanga, who also served as an officer of FPA and was a member of the Funds' boards of directors.[2] Brofman and Malanga also controlled plaintiff Fundamental Service Corp., Inc. (FSC), which operated as the distributor for the Funds.

When the Funds were first created, Brofman invested the assets in securities that had relatively low risk. In 1993, when the Funds' performance lagged compared to similar mutual funds, Brofman altered his investment strategies. Utilizing a more aggressive approach, he leveraged the assets of the Funds, making substantial investments in collateralized mortgage obligations (CMOs) and inverse floating-rate securities (inverse floaters), which were highly susceptible to changes in interest rates.

This new strategy initially proved to be successful. But in early 1994, the Federal Reserve raised interest rates, which caused the market for CMOs to quickly collapse and the value of inverse floaters to plummet. This took a dramatic toll on the performance of the Funds. For example, the net assets of the Fundamental US Government Strategic Income Fund, which approximated $60 million in June 1993, decreased to just over $30 million over the course of the following year. In addition, a leading market tracking service ranked that fund last in total returns out of 270 long-term government bond mutual funds.

As a result of Brofman's change in investment tactics and the financial losses borne by the Funds, the management of the Funds came under scrutiny and, in 1995, the Securities and Exchange Commission (SEC) began to investigate Brofman,

---

**1.** The individual funds are the New York Muni Fund, the Fundamental US Government Strategic Income Fund, the Fundamental High-Yield Municipal Bond Series, the Fundamental Tax-Free Money Market Series and the California Muni Fund.

**2.** Although the five mutual funds were separate corporate entities, the composition of their boards of directors was identical.

FPA and FSC.[3] Concerned that the Funds' boards of directors could remove FPA as advisor if regulatory problems persisted, Brofman and Malanga began exploring the possibility of transferring the management duties of the Funds to another investment advisory firm. In an attempt to locate a purchaser, in September 1996 Brofman and Malanga met with defendant Robert Kleinschmidt, president of defendant Tocqueville Asset Management, L.P. (Tocqueville), and Christopher Culp, one of its officers and portfolio managers, to discuss the potential acquisition of FPA's investment advisory assets.

Early in the course of their discussions, on September 24, 1996, Kleinschmidt and Culp executed a written nondisclosure and noncompete agreement that provided:

> "WHEREAS, [Kleinschmidt and Culp] and Brofman and Malanga intend discussing various business proposals involving the investment advisory and mutual funds business. . . .

> "[Kleinschmidt and Culp] agree not [to] solicit or engage in any business activity involving any of the mutual funds which have had, or ever in the future have business relationships with FPA or any company affiliated or associated with FPA, without prior written consent of both Brofman and Malanga."

The agreement further stated that "[n]o delay or omission by FPA, Brofman or Malanga in exercising any right under this Agreement will operate as a waiver of that or any other right" and that a "waver [sic] or consent given by FPA, Brofman and Malanga on any one occasion is effective only in that instance and will not be construed as a bar or waiver of any right on any other occasion."

Several months later, the Funds' boards of directors renewed FPA's contract but removed Brofman as chief portfolio strategist and prohibited him from participating in management of the Funds. FPA and Tocqueville reached a tentative agreement in early 1997 to transfer investment advisory duties from FPA to Tocqueville, allegedly in return for approximately $6 million

---

3. The SEC was not the first entity to inquire into the Funds' activities. In 1994, FPA and FSC settled charges brought by New York State claiming that sales materials for the New York Muni Fund misled investors by failing to disclose investments in inverse floaters. Four years later, FSC, Malanga and another individual settled charges levied by the National Association of Securities Dealers again related to the lack of disclosures in sales materials for the New York Muni Fund.

to be paid by Tocqueville over five years. In pursuit of this plan, Culp began working out of FPA's offices in order to conduct due diligence and learn how the Funds were managed. FPA provided Culp with access to its shareholder information, he was allowed to make presentations to the Funds' boards of directors and he served on a three-person investment committee that managed the Funds' assets after Brofman was removed as chief portfolio strategist.

Culp began advising the Funds and eventually the boards of directors voted to replace FPA as investment adviser once an acceptable alternative was found. Seeking to promote the anticipated $6 million acquisition, Malanga presented Tocqueville's management proposal to the boards. He also wrote to the boards "strongly endors[ing]" the change in adviser as being in the best interest of the Funds' investment performance since Tocqueville, through Culp's efforts, was "intimately acquainted" with the operation of the Funds and the composition of their portfolios.

The boards of directors subsequently solicited formal proposals from four investment advisory firms, including Tocqueville, for the future management of the Funds' assets. Only Tocqueville and another firm submitted proposals. At a July 1997 meeting of the boards, Malanga moved to accept Tocqueville's proposal and the boards unanimously agreed. A plan was thereby adopted to make the Funds part of a new family of mutual funds—the Tocqueville Funds—which would be managed by Tocqueville.

In September 1997, the SEC charged Brofman, Malanga, FPA and FSC with fraud for failing to disclose to investors that the Funds had invested heavily in inverse floaters, which led to the substantial losses in 1994. Three months later, when the Funds' management agreement with FPA was set to expire, the boards of directors approved a 90-day continuance of the contract (rather than the usual one-year extension) in expectation of Tocqueville's pending takeover. Because the transfer was not consummated at the end of that period, the boards gave FPA a further 60-day continuance.

By the beginning of 1998, Brofman apparently came to believe that Tocqueville intended to secure the Funds' business without compensating FPA. Based on this belief, at the end of January 1998 FPA's attorney sent a letter to Tocqueville reminding it of the terms of the noncompete agreement. The correspondence

indicated that FPA "fully intend[ed] to enforce this covenant, and to hold all persons and/or entities fully accountable for damages incurred by reason of its breach," including the "right to seek injunctive relief in a court of competent jurisdiction." The letter further stated that FPA remained "ready, willing and able to close the sale agreement originally struck with Tocqueville."

Tocqueville continued to do business with the Funds and campaigned to succeed FPA, even though the terms of the transfer arrangement with FPA had not been settled. In response, FPA sought to undermine Tocqueville's ascension to the adviser post by attempting to take control of the boards of directors. Brofman launched a proxy battle in April 1998 in hope of replacing board members who wanted to appoint Tocqueville with new members sympathetic to FPA. A shareholders' vote was scheduled for May 29, 1998—the day before FPA's final 60-day management extension was due to expire. Before this occurred, a director initiated an action in federal court challenging the vote on various grounds. A temporary restraining order was issued and the special vote did not take place.

On May 30, 1998, the boards of directors convened to select an interim adviser for the Funds. Proposals from FPA, Tocqueville and a third firm, Bull & Bear Advisers Inc., were considered. Despite Malanga's opposition, the boards voted to appoint Tocqueville as interim adviser for 120 days. At the end of that period, Tocqueville's contract was not extended and another firm, Cornerstone Equity Advisors, became the Funds' new adviser.

In 2001, Brofman, FPA and FSC initiated this proceeding against Kleinschmidt, Tocqueville Asset Management, L.P., Tocqueville Securities, L.P., Tocqueville Management Corporation, and three individuals involved with those entities,[4] premised on an alleged breach of the noncompete agreement.[5] The parties moved for summary judgment and Supreme Court denied FPA's motion but granted Tocqueville's motion, dismissing the complaint. The court concluded that FPA had waived the written consent requirement in the noncompete agreement by actively encouraging the boards of directors to rely on and hire

4. For purposes of this opinion, plaintiffs are collectively referred to as FPA and defendants are collectively referred to as Tocqueville.

5. The complaint also asserted causes of action for fraud and tortious interference with business relations. Supreme Court granted Tocqueville's motion to dismiss those claims and FPA did not appeal that decision.

Tocqueville and that, although FPA had revoked the waiver by challenging Tocqueville for the management post, FPA was otherwise estopped from enforcing the noncompete clause. The Appellate Division affirmed for similar reasons and held that dismissal of the action was further justified by FPA's inability to prove damages. A dissenting Justice would have denied summary judgment to both parties, reasoning that application of waiver and estoppel was inappropriate in light of the purpose of the noncompete agreement and the conflicting evidence in the record, and that the issue of damages was a question of fact to be determined at trial. The Appellate Division granted FPA leave to appeal to this Court. We now modify by denying Tocqueville's motion for summary judgment and otherwise affirm the denial of FPA's motion for summary judgment.

## II

FPA contends that summary judgment was granted erroneously to Tocqueville because the record discloses that Tocqueville did not obtain written consent to engage in business with the Funds and thus failed to comply with the noncompete agreement. FPA also claims that it did not waive the right to enforce the parties' agreement by permitting Tocqueville to work with the Funds' boards of directors and that a finding of waiver in this situation undermines the central purpose of the noncompete agreement, which was to ensure that Tocqueville would acquire management of the Funds only if an acceptable payment was made to FPA.

Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned (see Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 184 [1982]). Such abandonment "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage" (General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist., 85 NY2d 232, 236 [1995]; see Hadden v Consolidated Edison Co. of N.Y., 45 NY2d 466, 469 [1978]). However, waiver "should not be lightly presumed" and must be based on "a clear manifestation of intent" to relinquish a contractual protection (Gilbert Frank Corp. v Federal Ins. Co., 70 NY2d 966, 968 [1988]). Generally, the existence of an intent to forgo such a right is a question of fact (see Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y., 61 NY2d 442, 446 [1984]).

As Tocqueville argues and the Appellate Division majority observed, the record establishes as a matter of law that, for a

period of time, FPA waived enforcement of the noncompete agreement by consenting to Tocqueville's involvement with the Funds. Between late 1996, when the parties first began discussing the proposed transfer, and the beginning of 1998, FPA actively encouraged and assisted Tocqueville in developing a business relationship with the Funds. The purpose of FPA's conduct was evident: by allowing Tocqueville to take responsibility for the day-to-day management of the Funds, FPA wished to demonstrate to the boards of directors that Tocqueville would be a suitable replacement for FPA. This would induce the boards to retain Tocqueville and, in turn, Tocqueville would then pay a substantial sum to FPA for the acquisition of its management services. FPA supported this plan by allowing Culp (and his successor) to work from FPA's offices, have access to confidential information, serve on the three-person management committee and make presentations directly to the boards. The record does not indicate that Malanga, who served on the boards, voiced any complaint about Tocqueville's involvement but rather strongly endorsed the proposed transfer to his fellow board members. Thus, we agree with the Appellate Division that during the time that FPA fostered the business relationship between the Funds and Tocqueville, and actively promoted the hiring of Tocqueville as the new adviser, FPA waived the right to enforce Tocqueville's agreement not to conduct business with the Funds in the absence of FPA's written consent.

We conclude, however, that there is an issue of fact regarding the scope of FPA's waiver because Tocqueville did not satisfy its burden of proving as a matter of law that the initial waiver of the noncompete agreement continued after the nature of the dealings between the parties changed from cooperation to competition. Although the record does not reveal precisely when the relationship became adversarial, at some point after the boards of directors approved Tocqueville's management proposal at Malanga's urging in July 1997, the asset transfer negotiations between FPA and Tocqueville were abandoned and the situation devolved into a rivalry for the Funds' business. By early 1998, FPA ceased advocating for Tocqueville to assume the investment advisory business, Brofman launched his proxy battle to remove board members who wanted to hire Tocqueville and FPA submitted a proposal to continue providing investment management services at the same time a proposal was also submitted by Tocqueville.

Viewed in the light most favorable to FPA, as is appropriate in the context of Tocqueville's motion for summary judgment,

the record evidence in this case could lead a jury to conclude that FPA's opposition to the transfer was sufficient to put Tocqueville on notice that it should halt its dealings with the Funds in compliance with the noncompete agreement. Moreover, the noncompete agreement expressly anticipated that FPA would permit Tocqueville to have discussions and work with the Funds and that such consent would not operate as a permanent waiver of the right to prohibit Tocqueville from soliciting the Funds' business. On the other hand, a jury might find that, after being introduced to the Funds and promoted as a suitable successor, it was reasonable for Tocqueville to believe that FPA had no intention of enforcing the noncompete agreement in the absence of an explicit instruction to Tocqueville to cease and desist all business with the Funds. Similarly, if the threat posed by Tocqueville was as serious as Brofman alleges, a reasonable person might question why FPA competed with Tocqueville rather than utilizing the simple expedient of a cease and desist demand or seeking injunctive relief through legal recourse. In light of these competing considerations, it is clear that there are triable issues of material fact that must be resolved before it can be determined whether FPA fully or only partially waived its rights under the noncompete agreement.

## III

The Appellate Division determined that, even assuming there was only a partial waiver, summary judgment dismissing the breach of contract action is nevertheless appropriate because FPA should be estopped from invoking the noncompete agreement. As we have explained, estoppel

> "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought" (*Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d at 184; *see White v La Due & Fitch, Inc.*, 303 NY 122, 128 [1951]).

Thus, in the absence of evidence that a party was misled by another's conduct or that the party significantly and justifiably relied on that conduct to its disadvantage, "an essential ele-

ment of estoppel [i]s lacking" (*Lynn v Lynn*, 302 NY 193, 205 [1951]; *see Rose v Spa Realty Assoc.*, 42 NY2d 338, 344 [1977]).

■ Based on the plain language of the noncompete agreement and the course of the parties' dealings, the issue of whether equitable estoppel is warranted cannot be resolved in this case as a matter of law. By executing the agreement, Tocqueville understood that if a deal was not consummated it would be prohibited from engaging in business with the Funds. But similar to the issues surrounding application of the waiver doctrine, FPA's conduct creates a question of fact as to whether Tocqueville could justifiably rely on FPA's actions to reasonably conclude that the agreement would not be enforced and, if so, whether that belief induced Tocqueville to continue pursuing a contract with the Funds. We therefore decline to decide as a matter of law whether FPA should be estopped from invoking the noncompete clause.

## IV

■■ Lastly, there are also questions of fact on the issue of damages because there is conflicting evidence in the record regarding the amount of recovery that FPA may be entitled to if it sustains its burden of proving that the noncompete agreement was breached. While FPA alleges that Tocqueville agreed to pay $6 million for FPA's assets, Kleinschmidt asserts that this figure was merely a starting point for negotiations and that counteroffers were tendered by Tocqueville because of adverse tax consequences from the deal. FPA also relies on averments in the record regarding an alleged $4 million offer from Bull & Bear that, according to Brofman, may have been finalized had Tocqueville not submitted a proposal to the boards of directors in May 1998 in competition with FPA and Bull & Bear. Tocqueville contends that FPA suffered no damages because its contract would have been terminated by the boards even if Tocqueville had not become actively involved with the Funds and, in the event FPA is entitled to any recovery, its damages should be limited to what Tocqueville actually earned during its four-month stint as interim adviser to the Funds. Finally, Tocqueville also notes that Brofman reached a $6 million agreement with Cornerstone, the firm that ultimately succeeded Tocqueville as adviser of the Funds, whereas Brofman alleges that he never received any compensation under the agreement. Because Tocqueville has not proved as a matter of law that FPA suffered no damages, this issue must be resolved by the trier of fact if it is

determined that Tocqueville is liable for a breach of the non-compete agreement.[6]

## V

Accordingly, the order of the Appellate Division should be modified, without costs, by denying defendants' motion for summary judgment and, as so modified, affirmed. The certified question should not be answered upon the ground that it is unnecessary.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, READ and R.S. SMITH concur.

Order modified, etc.

---

**6.** ■ Tocqueville claims that FPA should be barred from any recovery because Brofman has been suspended from the securities industry for life by the SEC. This contention was raised by Tocqueville in its motion for summary judgment while the initial suspension order was on appeal but it was unnecessary for Supreme Court to address the merits of this argument because it ruled in favor of Tocqueville on the basis of waiver and estoppel. As a result, the effect of the lifetime suspension, which was only recently upheld by the United States Court of Appeals for the Second Circuit after the Appellate Division issued its decision in this case (*see Brofman v Securities & Exch. Commn.*, 167 Fed Appx 836 [2d Cir 2006]), is not before us.