Parlux Fragrances, LLC v S. Carter Enters., LLC (2022 NY Slip Op 01250)





Parlux Fragrances, LLC v S. Carter Enters., LLC


2022 NY Slip Op 01250


Decided on February 24, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 24, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick
Anil C. Singh Martin Shulman Bahaati E. Pitt John R. Higgitt


Index No. 650403/16 Appeal No. 14387-14387A Case No. 2020-04970, 2020-04972 

[*1]Parlux Fragrances, LLC, etc., et al., Plaintiffs-Appellants-Respondents,
v
S. Carter Enterprises, LLC, et al., Defendants-Respondents-Appellants.



Plaintiffs appeal, and defendants cross-appeal from the order of the Supreme Court, New York County (Andrew Borrok, J.), entered on or about November 16, 2020, which granted in part and denied in part plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment, to grant those aspects of defendants' motion seeking summary judgment (1) on the portion of their counterclaim premised on plaintiffs' failure to pay royalties, (2) dismissing plaintiffs' fifth cause of action (breach of the implied covenant of good faith and fair dealing), and (3) dismissing so much of the second cause of action (breach of contract) as asserted against defendant Shawn Carter based on article 7 of the license agreement. Plaintiffs also appeal and defendants cross-appeal from the supplemental order, same court and Justice, entered on or about November 19, 2020, which denied defendants' motion for entry of judgment on their counterclaim for royalty payments.




Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., New York (Anthony J. Viola, Andre K. Cizmarik, Kara M. Cormier and Kaitlyn A. Crowe of counsel), for appellants-respondents.
Quinn Emanuel Urquhart & Sullivan LLP, New York (Ellyde R. Thompson, Alex Spiro, Cory D. Struble and Allison McGuire of counsel), for respondents-appellants.



Higgitt, J. 


This appeal and cross appeal arise from the parties' dispute relating to the development and promotion of a fragrance line involving defendant Carter, the Grammy-winning entertainment mogul otherwise known as Jay-Z.
I.
On April 18, 2012, defendants entered into a license agreement with nonparty Artistic Brands Development LLC (Artistic Brands) for the development and promotion of the fragrance line and related products. The license agreement granted nonparty Artistic Brands the exclusive right to use the trademark Jay-Z. The trademark relates to Carter and is held by S. Carter Enterprises, LLC (SCE). Carter, the sole member and manager of SCE, signed the license agreement on behalf of SCE. Additionally, Carter signed the license agreement in his personal capacity, but only with respect to sections 2C, 2D, and 11E. Carter's execution of those three aspects of the license agreement in his personal capacity reflected his personal involvement in the development and promotion of the fragrances that would be associated with his considerable professional identity and brand.
The meaning and effect of several articles of the license agreement are central to the issues disputed on appeal.
Section 2B provides, in pertinent part, that
"[Artistic Brands] is contemporaneously herewith sub-licensing the Licensed Mark to a subsidiary of Perfumania Holdings, Inc. (collectively, 'Perfumania'), subject to and on the same terms and conditions as set forth in th[e] [licensing agreement] pursuant to a sublicense agreement between [Artistic Brands] and Perfumania dated as of even date herewith (the 'Sublicense') . . . Pursuant to the Sublicense, Perfumania [*2]is inter alia guaranteeing to [SCE] and [Carter] the performance by Perfumania and [Artistic Brands] of all the terms, obligations, warranties, restrictions, payments and conditions contained in [the licensing] [a]greement as though Perfumania were a party hereto. It is the essence of this [licensing] [a]greement that [Artistic Brands] contemporaneously enter into the Sublicense and that Perfumania guarantees in writing to [SCE] the performance by [Artistic Brands] and Perfumania of all the terms, obligations, restrictions, warranties, payments and conditions contained in this [licensing] [a]greement and any exhibits or agreements incorporated by reference herein."
Section 7C states, in relevant part, that
"Throughout the Term of th[e] [licensing] [a]greement, [SCE] and [Artistic Brands] shall work together in good faith in deciding the types of articles of Licensed Products that [Artistic Brands] may manufacture, sell, and market, all subject to [SCE's] reasonable approval. [Artistic Brands] shall provide [SCE] with a product development plan for each line of all Licensed Products, which plan may include [Artistic Brands'] assessment of market needs and competitive positioning, and such additional information as reasonably requested by [SCE].
"(i) [Artistic Brands] and [SCE] shall jointly establish product development calendars, under which at appropriate agreed points throughout the development process of Licensed Products, [Artistic Brands] shall make available to [SCE] the concepts, materials, fabrications (if applicable), packaging and other relevant contents of each line of all Licensed Products for [SCE's] prior written approval as to concept interpretation, workmanship and quality and to assure that Licensed Products are consistent in quality with comparable prestige products such as those referred to in Section 7A(i) above and with [SCE's] standing and reputation with the public. The parties shall make every reasonable effort to adhere to the product development calendars.
"(ii) For each new line of Licensed Products (other than items from prior lines to be continued), [Artistic Brands] shall prepare and deliver to [SCE], for its prior written approval, product concepts and specifications for those Licensed Products that it proposes to include in such line in accordance with the approved product development plan. The various lines of Licensed Products shall be created from such initial concepts and specifications, which shall then be modified and developed cooperatively by [SCE] and [Artistic Brands] until [SCE] has approved, in writing, a line which, including items from prior lines to be continued, is consistent with the approved product development plan."
Subparagraph iii of section 7C provides the specifics of the product development approval process between Artistic Brands (and, naturally, its sublicensee) and SCE. Notably, section 7C(iii) states that
"All decisions by [SCE] shall be subject to the approval timing and other approval procedures that are set forth in Section 7A above and any disapproval of any Licensed Product shall be made in [SCE's] reasonable discretion, and shall be accompanied with an explanation and, if possible, a proposed solution or alternative design, concept and/or execution. Should [SCE] fail to give its approval, [SCE] agrees to engage in good faith negotiations with [Artistic Brands] to solve whatever objections [SCE] may have. After such negotiations conclude and an agreement is not reached, then [SCE's] disapproval shall be final and binding and shall not be subject to review in any proceeding."
Section 11E states, in relevant part, that
"[SCE] undertakes, at [Artistic Brands'] sole expense and subject to [Carter's] prior professional commitments, at [Artistic Brands'] request to make [Carter] available at reasonable intervals and for reasonable periods (which shall involve at least three (3) appearances in each Sales Year of the Term, at least one of which shall take place in New York City) for promotional tie-ins serving to associate [Carter] with the Licensed Products. During the Term and in the Territory, [Artistic Brands] shall also be entitled to the non-exclusive use of [Carter's] approved likeness, and approved signature solely for advertising, packaging and promotional purposes upon [SCE's] approval first being obtained in each instance, which approval shall not be unreasonably withheld or delayed. [SCE's] failure to approve any representation of [Carter's] signature or likeness within twenty (20) business days of written request therefor shall be deemed an approval thereof. [SCE] shall make every reasonable effort, in light of [Carter's] busy schedule and subject to [Carter's] prior professional commitments, at the request of [Artistic Brands] and upon at least twenty (20) business days written notice, to arrange for [Carter's] cooperation for a reasonable number of publicity events (which shall be included in [Carter's] obligations of three (3) appearances discussed above)."
Sections A and C of article 12 specify various statements, reports, and plans that Artistic Brands (and its sublicensee) were required to deliver to defendants.
Article 15 of the license agreement addressed defaults, identifying those conditions and occurrences that constituted "events of default" (including plaintiffs' failure to pay defendants any sum due under the license agreement, and plaintiffs' "failure to deliver full and accurate reports pursuant to any of the provisions of th[e] [license agreement] by the prescribed due date therefor") for which the other party had to serve on the defaulting party a notice of default.
Section 18F contains the license agreement's no waiver provision. It states that "[n]o waiver by either party, whether express or implied, of any provision of th[e] [License] Agreement, or of any breach or default thereof, shall constitute a continuing waiver of such provision or of any other provision of this Agreement."
Lastly, section 20A of the license agreement sets forth a number of "conditions" that had to be satisfied before the license agreement would be effective. Notably, contemporaneous with the execution of the license agreement, "Perfumania" was required (1) to execute a sublicense agreement with Artistic Brands, (2) to issue to SCE warrants to purchase, at a designated price, a specified quantity and quality of common stock in "Perfumania," and (3) to sign a particular letter assigning certain profits to SCE. Section 20B provides that defendants "have a direct claim against Perfumania on the guaranty for breaches of the [licensing] [a]greement."
Consistent with section 20A, two other transactions occurred on April 18, 2012. In one transaction, Artistic Brands sub-licensed its rights and obligations under the license to plaintiff Parlux Fragrances, LLC (Parlux), a subsidiary of plaintiff Perfumania Holdings, Inc. (Perfumania). Parlux "assume[d] all of [Artistic Brands'] obligations . . . under the [licensing] [a]greement." The signatories to the sublicense agreement were, through their respective members or agents, Parlux, defendants, and Artistic Brands. In the other transaction, Perfumania executed the assignment letter with SCE and Artistic Brands. Under the assignment letter, certain profits derived from the licensing of the Jay-Z trademark were assigned to SCE. Additionally, at some point Perfumania provided Carter with approximately $2.8 million in common stock in that corporation.
II.
During the 2013 holiday season, Parlux launched a product line called GOLD JAY-Z, investing approximately $15 million to develop, manufacture, and promote this fragrance. Although the product launch was a success, with GOLD JAY-Z representing Parlux's top-selling fragrance in the United States for a time, plaintiffs were disappointed with the overall performance of GOLD JAY-Z. As discussed below, plaintiffs attribute the lackluster (in their eyes) sales performance of GOLD JAY-Z to certain breaches of the license agreements [FN1] by defendants relating to Carter's alleged failure to endorse and promote the fragrance in the manner required under the license agreement.
Plaintiff Parlux sought to release a "flanker" fragrance the following holiday season (late 2014/early 2015); the flanker fragrance was to represent a new product line based on the GOLD JAY-Z line. One flanker fragrance  GOLD JAY-Z EXTREME  was released, but that release was apparently limited in scope. No other flanker fragrance was released; however, GOLD JAY-Z itself remained on the fragrance market, generating sales. Plaintiffs had greater expectations for Jay-Z related flanker fragrances, but those expectations were not realized.
The parties' relationship deteriorated throughout the first half of 2015, and by July 2015 plaintiffs ceased making royalty payments to defendants.
III.
In January 2016, plaintiffs commenced this action to, among other things, recover damages against [*3]defendants, asserting causes of action for breach of the license agreements, and breach of the implied covenant of good faith and fair dealing. Plaintiffs alleged that Carter refused to endorse and promote GOLD JAY-Z in the manner required by article 11 of the license agreement, and that he frustrated the development of flanker fragrances in breach of article 7 of the license agreement. Plaintiffs also alleged that defendants' breaches of the license agreements and the implied covenant of good faith and fair dealing resulted in millions of dollars in lost sales of GOLD JAY-Z and flanker fragrance products.
Defendants served an answer containing, among other things, a counterclaim against plaintiffs for breach of the license agreements, and a counterclaim against Perfumania for breach of guaranty. Pursuant to a stipulation, defendants withdrew the aspect of their counterclaim for breach of the license agreements that was premised on plaintiffs' alleged failure to provide defendants with various plans and reports, such as a product development plan for the flanker fragrance (section 7C), quarterly and annual reports relating to product sales and promotional expenditures (section 12A), and annual business plans (section 12C). Defendants' counterclaim seeking damages for breach of the license agreements was therefore limited to claims that plaintiffs breached their contractual obligations to pay royalties and remit certain promotional spending shortfalls to defendants. Defendants' assertion that plaintiffs failed to provide defendants with various plans and reports under sections 7C, 12A and 12C, an assertion they consistently pressed during this litigation, became, in effect, an unpleaded affirmative defense to plaintiffs' claims for breach of the license agreements.
IV.
Plaintiffs subsequently moved for summary judgment dismissing, among other things, any affirmative defense by defendants that plaintiffs failed to provide plans and reports required under sections 7C and 12A and C, and to preclude defendants from raising any such defense. Also, plaintiffs sought summary judgment dismissing defendants' counterclaim against Perfumania for breach of guaranty.
Defendants moved for summary judgment on their counterclaim seeking damages for breach of the license agreements, and dismissal of plaintiffs' complaint.
In a thorough decision and order, Supreme Court, among other things, denied those aspects of plaintiffs' motion seeking summary judgment dismissing any affirmative defense that they failed to provide plans and reports required under sections 7C and 12A and C, and defendants' counterclaim against Perfumania for breach of guaranty. In addressing the plans-and-reports provisions of the license agreement, Supreme Court rejected plaintiffs' contention that defendants waived their rights to receive the relevant plans and reports, and concluded that the product development plan called for by section 7C was a condition precedent to defendants' [*4]contractual obligations to work in good faith with Parlux to develop flanker fragrances. The court found that triable issues of fact existed regarding whether Parlux satisfied that condition.[FN2]
With respect to defendants' motion, Supreme Court, in effect, granted them summary judgment on the issue of liability on that aspect of their counterclaim premised on plaintiffs' failure to pay royalties required under articles 8 and 9 of the license agreement. The court observed that plaintiffs never terminated the license agreements, continuing to market and sell GOLD JAY-Z until at least May 2017. Yet, the court further observed, plaintiffs made no royalty payments after April 2015. The court found, however, that plaintiffs could be entitled to a setoff against the amount they owed defendants in royalties if, at trial, plaintiffs prevailed on one or more of their causes of action against defendants. Supreme Court denied that aspect of defendants' motion seeking summary judgment dismissing plaintiffs' cause of action for breach of the license agreements, finding that various triable issues of fact existed as to plaintiffs' and defendants' respective performances under articles 7 and 11 of the license agreement. Lastly, Supreme Court denied that aspect of defendants' motion seeking summary judgment dismissing plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing, rejecting defendants' arguments that the cause of action was duplicative of plaintiffs' cause of action for breach of the license agreements, and, as pleaded and litigated, sought to impose obligations that were inconsistent with defendants' obligations under the license agreement.[FN3]
In response to an inquiry from counsel seeking clarity regarding the court's determination of that aspect of defendants' motion seeking summary judgment on their counterclaim, the court stated, in a supplemental order, that defendants were not entitled to enter judgment for the sum desired on that aspect of their counterclaim premised on plaintiffs' failure to pay royalties because, as expressed in the decision and order, plaintiffs may, depending on the outcome of the trial, be entitled to a setoff on the amount owed for unpaid royalties.[FN4]
V.
On appeal,[FN5] plaintiffs take issue with several aspects of Supreme Court's decision and order adjudicating the summary judgment motions.
First, plaintiffs assert that the court should have granted that aspect of their motion seeking summary judgment dismissing the affirmative defense relating to plaintiffs' failure to provide defendants with plans and reports. Plaintiffs argue that defendants elected to continue the license agreement in the face of plaintiffs' breaches,[FN6] and waived any affirmative defense premised on such breaches.
Second, plaintiffs maintain that the court erred in concluding that, under section 7C of the license agreement, plaintiffs' provision to defendants of a product development plan was a condition [*5]precedent (as opposed to a mere contractual right or promise) to defendants' performance. Plaintiffs argue that section 7C contained no language demonstrating that defendants' performance was conditioned on the happening of any event or promise. Moreover, plaintiffs argue that defendants did not plead any affirmative defense, based on failure of a condition precedent, with the particularity demanded by CPLR 3015.
Third, plaintiffs take issue with the court's denial of that aspect of their motion seeking summary judgment dismissing defendants' counterclaim against Perfumania. Plaintiffs argue that Perfumania is not a guarantor of performance of the license agreement because Perfumania is not a signatory to any document imposing such an obligation on Perfumania. Plaintiffs maintain that, under the terms of the license agreement, Parlux (not Perfumania) is the guarantor of the obligations under the license agreement.
For their part, defendants cross-appeal from the portions of Supreme Court's decision and order that denied the aspects of their motion seeking summary judgment on their counterclaim for breach of the license agreements,[FN7] dismissal of plaintiffs' cause of action for breach of the license agreements, and dismissal of plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing.
Defendants argue that they are entitled to summary judgment on the counterclaim seeking damages for breach of the license agreements because plaintiffs breached the agreements by failing to make certain contractually mandated royalty payments and by failing to spend certain minimum amounts to promote GOLD JAY-Z products (or remit promotional spending shortfalls to defendants).
Defendants assert that plaintiffs' cause of action for breach of the licenses should be dismissed because defendants did not breach their obligations to promote GOLD JAY-Z or work with plaintiffs to develop a flanker fragrance. Specifically, defendants insist that plaintiffs knew or should have known that Carter would not be available on the promotional appearance dates selected by plaintiffs, and that, with respect to one of the dates, plaintiffs failed to give defendants sufficient notice of the date. Defendants maintain that plaintiffs' breach-of-license-agreements claim against Carter premised on article 7 must be dismissed because he is not a signatory to that article.
Defendants contend that plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing must be dismissed because it is duplicative of plaintiffs' cause of action for breach of the license, and, as framed by plaintiffs, would impose on Carter obligations that are not required by the license agreements themselves.
VI.
A.
With respect to Supreme Court's denial of that aspect of plaintiffs' motion seeking summary judgment dismissing any affirmative defense alleging that they failed to provide plans and reports required under sections [*6]7C and 12A and C, we agree with plaintiffs that none of the plans-and-reports provisions presents an express condition precedent to defendants' obligations; rather, the plans-and-reports provisions represent contractual promises.[FN8] However, triable issues of fact exist as to the extent plaintiffs breached their contractual promises to provide various plans and reports, and whether defendants elected to continue performance of the license agreements or waived some or all of those breaches.
Preliminarily, among the various plans-and-reports provisions in the license agreement, only one was characterized by Supreme Court as a condition precedent: the product development plan contained in section 7C. Defendants agree with Supreme Court's finding that the section 7C product development plan was a condition precedent, and they do not argue that any of the other plans-and-reports provisions should be so characterized. We conclude that plaintiffs' provision of a product development plan was not a condition precedent to defendants' obligations under section 7C of the license agreement.
"A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises" (Oppenheimer & Co., 86 NY2d at 690 [internal quotation marks omitted]). An express condition  that is, one agreed to by the parties that must be literally performed (substantial compliance will not suffice)  must be reflected in clear, express language (see id. at 691); "[c]ourts are reluctant to interpret a contractual clause as a condition precedent in the absence of . . . unmistakable conditional language" (VXI Lux Holdco S.A.R.L. v SIC Holdings, LLC, 171 AD3d 189, 195 [1st Dept 2019]).
Section 7C does not contain any of the traditional unmistakable forms of conditional language (e.g., "if," "unless and until," "null and void") demonstrating that plaintiffs' provision of a product development plan was an express condition to defendants' obligations; rather, section 7C uses a word commonly associated with contractual promises: "shall" (see id.). Moreover, section 20A of the license agreement lists various "conditions," and the provision of a product development plan is not among them (cf. Merritt Hill Vineyards v Windy Hgts. Vineyard, 61 NY2d 106, 112-113 [1984]). Therefore, plaintiffs' provision of section 7C's product development plan, like the provision of other plans and reports required by sections 12A and C, is a contractual promise, not a condition precedent.[FN9]
As noted above, however, triable issues of fact exist as to the extent plaintiffs breached their contractual promises to provide various plans and reports, and, as discussed below, whether defendants elected to affirm (and continue) the licensing agreements, or otherwise waived their rights to receive the plans and reports they allege they did not receive.
Under the election of remedies doctrine, a party, upon [*7]learning of a material breach of a contract, must choose between terminating the contract and continuing performance (see Emigrant Indus. Sav. Bank v Willow Bldrs., 290 NY 133, 144 [1943]; 13 Richard A. Lord, Williston on Contracts § 39:32 at 700-705 [4th ed 2021]). The innocent party has a reasonable time to make the election (see ESPN, Inc. v Office of Commissioner of Baseball, 76 F Supp 2d 383, 393-394 [SD NY 1999]). Based on the extensive factual record, including the deposition testimony of various representatives of the corporate entity parties and documentary evidence (e.g., emails), triable issues of fact exist regarding whether defendants' words and conduct following any such breach amounted to an election by defendants to affirm the contract.[FN10]
Similarly, triable issues of fact exist regarding whether defendants waived their rights to unreceived plans and reports.[FN11] Waiver of a contractual right occurs when the non breaching party manifests a clear intention to relinquish the right (see Fundamental Portfolio Advisers, Inc. v Tocqueville Asset Mgt., L.P., 7 NY3d 96, 104-105 [2006]). A waiver will not be lightly presumed (see id.; see also Navillus Tile v Turner Constr. Co., 2 AD3d 209, 211 [1st Dept 2003]), and the issue of whether a party waived a particular contractual right is generally for the jury (see Fundamental Portfolio Advisers, Inc., 7 NY3d at 105-106). The extensive factual record before us demonstrates the existence of triable issues of fact regarding whether defendants, notwithstanding the particular no-waiver clause in the license agreement (see, e.g., Paramount Leasehold, L.P. v 43rd St. Deli, Inc., 136 AD3d 563, 568 [1st Dept 2016], lv denied 28 NY3d 1024 [2016]; 28A Glen Banks, New York Contract Law § 28:9 [2d ed 2017]), waived their rights to plans and reports that plaintiffs did not provide.
Thus, Supreme Court properly denied summary judgment dismissing the plans-and-reports affirmative defense.
B.
Supreme Court also properly denied that aspect of plaintiffs' motion seeking summary judgment dismissing defendants' counterclaim against Perfumania for breach of the guaranty.
The license agreement, the sublicense agreement, and the assignment letter were executed almost simultaneously, relate to the same subject matter, and are plainly part of the same interrelated transaction. Therefore, those documents must be read together (see MPEG LA, LLC v Samsung Elec. Co., Ltd., 166 AD3d 13 [1st Dept 2018], lv denied 32 NY3d 912 [2018]; Applehead Pictures LLC v Perelman, 80 AD3d 181, 199 [1st Dept 2010]).
Reading those documents together and giving effect to the relevant unambiguous terms of those documents (see Vintage, LLC v Laws Constr. Corp., 13 NY3d 847 [2009]), Perfumania is a guarantor. Section 2B of the license agreement provides that "[Artistic Brands] is contemporaneously herewith sub-licensing the Licensed Mark to a subsidiary of Perfumania Holdings, Inc. (collectively, 'Perfumania')." The word "collectively[*8]" makes sense and has effect only if it is read to include a subsidiary of Perfumania (i.e., plaintiff Parlux) and Perfumania itself (see Beal Savings Bank v Sommer, 8 NY3d 318, 324-325 [2007], rearg denied 8 NY3d 993 [2007]).
That "Perfumania," as used in the license agreements, refers to both Parlux and Perfumania is reinforced later in section 2B. Part of the guaranty provision of that section states that "[i]t is the essence of this [licensing] [a]greement that [Artistic Brands] contemporaneously enter into the Sublicense and that Perfumania guarantees in writing to [SCE] the performance by [Artistic Brands] and Perfumania of all the terms, obligations, restrictions, warranties, payments and conditions contained in this [licensing] [a]greement and any exhibits or agreements incorporated by reference herein" (emphasis added). If "Perfumania" was read to mean Parlux only, then Parlux would be charged with guarantying its own performance. That absurd reading of section 2B must be avoided (see Greenwich Capital Fin. Prods., Inc. v Negrin, 74 AD3d 413, 415 [1st Dept 2010]). Because "Perfumania" as defined by section 2B includes both plaintiffs, a natural, sensible view of that section's guaranty provision emerges: Perfumania guarantees performance by Artistic Brands and Parlux. 
Further reinforcement that "Perfumania," as defined in the license agreements, refers to both plaintiffs is provided by section 20A of the license agreement.
In that article, "Perfumania" was required (1) to execute a sublicense agreement with Artistic Brands, (2) to issue to SCE warrants to purchase, at a designated price, a specified quantity and quality of common stock in "Perfumania," and (3) to sign a particular letter assigning certain profits to defendant SCE. As reviewed above, Parlux executed the sublicense agreement, and Perfumania issued the stock warrants to SCE and signed the assignment letter. Thus, "Perfumania"  both Parlux and Perfumania  performed under section 2B.
Because "Perfumania" as defined in section 2B plainly includes both Parlux and Perfumania, the latter is a guarantor.
That Perfumania signed the assignment letter as opposed to the sublicense does not, in light of the content of the various transactional documents described above, pose a statute of frauds problem for defendants. The statute of frauds (here, General Obligations Law § 5-701[a][2]) is satisfied "by multiple writings, signed and unsigned, provided that all of the terms '[are] set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, . . . bear[s] the signature of the party to be charged, while the unsigned document . . . on its face refer[s] to the same transaction as that set forth in the one that was signed" (Taylor Diversified Corporate Servs., Inc. v AMBAC Assur. Corp., 81 AD3d 810, 811 [1st Dept 2011], quoting Crabtree v Elizabeth Arden Sales Corp., 305 NY 48, [*9]55-56 [1953]).
Thus, Supreme Court properly denied that aspect of plaintiffs' summary judgment motion seeking to dismiss defendants' counterclaim against Perfumania for breach of guaranty.
C.
Defendants are correct that they are entitled to summary judgment on that aspect of their counterclaim premised on plaintiffs' failure to pay royalties required under articles 8 and 9 of the license agreement. The record is clear: Parlux sold licensed products after July 31, 2015, but failed to pay royalties on those sales. Plaintiffs' contention that no judgment on the royalties counterclaim is warranted because defendants may have some liability to plaintiffs on their claims in this action is without merit. Simply put, "there is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable" (Willett v Lincolnshire Mgt., 302 AD2d 271, 271 [1st Dept 2003] [citation omitted]; see Boscorale Operating v Nautica Apparel, 298 AD2d 330, 331-332 [1st Dept 2002]; see also New Haven Props. v Grinberg, 293 AD2d 386 [1st Dept 2002]). Thus, defendants are entitled to summary judgment on their royalties counterclaim.
D.
Supreme Court correctly denied that aspect of defendants' motion seeking summary judgment dismissing plaintiffs' cause of action for breach of the license agreements.
Defendants' contention that plaintiffs' breaches of the license agreements bar plaintiffs' damages claims is without merit. Defendants are, of course, correct that plaintiffs' performance under the license agreements is an element of plaintiffs' breach-of-license-agreements claim (see Markov v Katt, 176 AD3d 401 [1st Dept 2019]; Dorfman v American Student Assistance, 104 AD3d 474 [1st Dept 2013]). However, neither plaintiffs' breach of the royalty provisions of the license agreement nor their breach of their contractual duty to spend certain minimum amounts to promote GOLD JAY-Z products (or remit certain promotional spending shortfalls to defendants) necessarily precludes their claims for defendants' alleged breaches of sections 7C and 11E.
A material breach of the license agreement by plaintiffs would afford defendants a choice: affirm the license agreements and continue with them, or terminate the agreements and seek redress for a total breach (see 28 Glen Banks, New York Contract Law § 17:19 at 1048-1051 [2d ed 2017]; see also Rebecca Broadway Ltd. Partnership v Hotton, 143 AD3d 71, 80-81 [1st Dept 2016]). But if a breach was not material, or defendants elected to continue with the license agreements in the wake of a material breach, the license agreements remained in force and performance by defendants was not excused (see 28A New York Contract Law § 20:24 at 42-43). Similarly, defendants were free to waive their right to treat a material breach by plaintiff as grounds for termination of the license agreements and continue with the agreements (see id. at § 20:25). Here, the extensive factual record demonstrates the existence [*10]of triable issues of fact with respect to whether defendants elected to affirm the license agreements after a material breach by plaintiffs, or otherwise waived their right to treat a material breach by plaintiffs as ground for termination.
Defendants' contentions that a written request from plaintiffs, at least 20 business days before any proposed appearance by Carter, was an express condition to their performance under section 11E, and that plaintiffs' failure to give such requests discharged defendants' contractual duties under that article, are without merit. Section 11E contains none of the traditional unmistakable forms of conditional language (e.g., "if," "unless and until," "null and void") demonstrating that the 20-day written-request provision was an express condition to defendants' obligations (see VXI Lux Holdco S.A.R.L., 171 AD3d at 195). Moreover, the 20-day written-request provision is not listed among the "conditions" specified in section 20A of the license agreement (cf. Merritt Hill Vineyards, 61 NY2d at 112-113). Therefore, like section 7C's product development plan, the 20-day written-request provision under section 11E was a mere promise, not an express condition.
With regard to the substance of plaintiffs' cause of action for breach of the license agreements, triable issues of fact exist regarding whether defendants breached their obligations to promote GOLD JAY-Z (article 11) or work with plaintiffs in good faith to develop flanker fragrances (article 7), and whether defendants elected to continue the license agreements or otherwise waived their right to receive 20-day written requests under section 11E.
E.
Carter, who signed the license agreement in his personal capacity with respect to sections 2C, 2D, and 11E, is entitled to summary judgment dismissing plaintiffs' breach-of-license-agreements claim premised on article 7 of the license agreement (see Weintraub v Vigilant Protective Sys., 36 AD2d 529 [1st Dept 1971]). The record does not support piercing SCE's corporate veil to reach Carter; evidence of domination without a showing that the domination led to wrongful or inequitable consequences is insufficient to pierce a corporate veil (see TNS Holdings v MKI Sec. Corp., 92 NY2d 335, 339-340 [1998]; see also Skanska USA Bldg. Inc. v Atlantic Yards B2 Owner, LLC, 146 AD3d 1, 12 [1st Dept 2016] [holding that a breach of contract, without more, does not constitute the requisite fraud or wrong], affd 31 NY3d 1002 [2018]).
F.
Defendants are entitled to summary judgment dismissing plaintiffs' fifth cause of action alleging breach of the implied covenant of good faith and fair dealing.
The implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002] [internal quotation marks omitted[*11]]), and is breached when a party acts in a manner that deprives the other party of the benefits of the contract (id.). Generally, a breach of the covenant of good faith and fair dealing is a breach of the contract itself (Boscorale Operating, LLC, 298 AD2d at 331). Therefore, a separate cause of action for breach of the covenant cannot be maintained where, as here, "it is premised on the same conduct that underlies the breach of contract cause of action and is intrinsically tied to the damages allegedly resulting from a breach of the contract" (MBIA Ins. Corp. v Merrill Lynch, 81 AD3d 419, 419—420 [1st Dept 2011] [internal quotation marks omitted]; see Mill Fin., LLC v Gillett, 122 AD3d 98, 104-105 [1st Dept 2014]). Because a breach of the covenant of good faith and fair dealing is a breach of the contract itself, plaintiffs may press their theory that defendants acted in derogation of the covenant in conjunction with their cause of action for breach of the license agreements (see Boscorale Operating, 298 AD2d at 331). We note that to the extent defendants were entitled to exercise discretion in the manner in which they performed their obligations under articles 7 and 11, they were, under the covenant (and, by natural extension, under the license agreement itself) prohibited from acting arbitrarily, irrationally, or in bad faith (Dalton v Educational Testing Serv., 87 NY2d 384, 389 [1995]).
VII.
Defendants' appeal from the supplemental order is dismissed because that order was not the product of a motion on notice (see CPLR 2214); rather, the supplemental order was issued in response to an inquiry from counsel seeking clarity regarding the court's decision and order determining the summary judgment motions (see CPLR 5701[a][2]; Sholes v Meagher, 100 NY2d 333 [2003]). 
Accordingly, the order of the Supreme Court, New York County (Andrew Borrok, J.), entered on or about November 16, 2020, which granted in part and denied in part plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment, should be modified, on the law, to grant those aspects of defendants' motion seeking summary judgment (1) on the portion of their counterclaim premised on plaintiffs' failure to pay royalties, (2) dismissing plaintiffs' fifth cause of action (breach of the implied covenant of good faith and fair dealing), and (3) dismissing so much of the second cause of action (breach of contract) as asserted against defendant Shawn Carter based on article 7 of the license agreement, and otherwise affirmed, without costs. The appeal from supplemental order, same court and Justice, entered on or about November 19, 2020, which denied defendants' motion for entry of judgment on their counterclaim for royalty payments, should be dismissed, without costs, as taken from an
order that was not the result of a motion made on notice.
Order, Supreme Court, New York County (Andrew Borrok, J.), entered on or about November 16, 2020, modified, on the law[*12], as indicated, and otherwise affirmed, without costs. Order, same court, and Justice, entered on or about November 19, 2020, dismissed, without costs, as taken from an order that was not the result of a motion made on notice.
Opinion by Higgitt, J. All concur.
Kapnick, J.P., Singh, Shulman, Pitt, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 24, 2022



Footnotes

Footnote 1: For ease of reference the license agreement and sublicense are referred to collectively as "the license agreements." Where specific reference to one of those documents is necessary, the document will be expressly identified.

Footnote 2: Based on the stipulation described above limiting the scope of defendants' breach-of-license-agreements counterclaim, Supreme Court granted plaintiffs summary judgment dismissing that aspect of defendants' counterclaim for breach of the license agreements that was premised on plaintiffs' alleged failure to provide defendants with various plans and reports under sections 7C and 12A and C. That determination has not been challenged on appeal. Additionally, plaintiffs sought but were denied summary judgment dismissing that aspect of defendants' counterclaim seeking damages for plaintiffs' alleged breach of their obligations to remit certain promotional spending shortfalls to defendants under article 11 of the license agreement. Plaintiffs do not take issue with that determination.

Footnote 3: Supreme Court granted defendants summary judgment dismissing plaintiffs' causes of action for rescission. Plaintiffs do not challenge those portions of the summary judgment decision and order.

Footnote 4: The court did allow for entry of a circumscribed judgment reflecting that certain royalty payments had not been made, i.e., a judgment on the issue of liability on the counterclaim premised on plaintiffs' failure to pay royalties.

Footnote 5: Shortly after oral argument of this appeal, the parties proceeded to trial. (A stay of trial was sought by defendants, opposed by plaintiffs, and denied by this Court.) The parties have not alerted us as to the outcome of the trial; however, based on our review of public court records, a verdict was rendered. Additionally, the public court records disclose that the parties are presently engaged in posttrial motion practice. No party has suggested to us that this appeal has been rendered moot, and, given our conclusion that certain summary relief is warranted (i.e., judgment as a matter of law), we conclude that the appeal is not moot.

Footnote 6: For the purposes of resolving the appeal and cross appeal, plaintiffs are willing to allow this Court to assume that defendants did not receive the various plans and reports, and, if they did receive them, that they were deficient in some way.

Footnote 7: Relatedly, defendants appeal from the supplemental order that denied their motion for entry of judgment on that aspect of their counterclaim premised on plaintiffs' failure to pay royalties.

Footnote 8: There are two types of conditions precedent: express conditions and implied (or constructive) conditions. "Express conditions are those agreed to and imposed by the parties themselves. Implied or constructive conditions are those imposed by law to do justice" (Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 NY2d 685, 690 [1995] [internal quotation marks omitted]). Supreme Court appears to have found that the product development plan provision constituted an express condition, and the parties' briefs are focused primarily on whether plaintiffs' provision of a product development plan was an express condition.

Footnote 9: In light of our conclusion that the product development plan provision was not a condition precedent, plaintiffs' CPLR 3015 argument is academic.

Footnote 10: If the finder of fact concludes that defendants elected to continue with the license agreements in spite of plaintiffs' breaches of the plans-and-reports provisions (or otherwise waived their rights to the plans and reports), defendants' affirmative defense relating to the plans-and-reports provisions would fail (see Computer Possibilities Unlimited v Mobil Oil Corp., 301 AD2d 70, 80 [1st Dept 2002], lv denied 100 NY2d 504 [2003]).

Footnote 11: Waiver and election of remedies are technically distinct doctrines: an election is a choice by the non-breaching party between two inconsistent rights, whereas a waiver (in its purest form) is the relinquishment of a contractual right (see 13 Richard A. Lord, §§ 39:31-39:32 at 697-705 [4th ed 2021]; 28 Glen Banks, New York Contract Law § 17:21 at 1054 [2d ed 2017]). In reality, the distinction between the two doctrines can be elusive (see Kamco Supply Corp. v On the Right Track, LLC, 149 AD3d 275, 282-283 [2d Dept 2017], lv dismissed 30 NY3d 1036 [2017]).