*Wiener v. AXA Equitable Ins. Co.*

In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2023

(Argued: September 22, 2023   Decided: August 21, 2024)

Docket No. 22-894

MALCOLM H. WIENER,

*Plaintiff-Appellant*,

−v.−

AXA EQUITABLE LIFE INSURANCE COMPANY, DAVID HUNGERFORD, AXA ADVISORS, LLC, AND AXA NETWORK, LLC,

*Defendants-Appellees.*

Before:      BIANCO, ROBINSON, and NATHAN, *Circuit Judges*.

Plaintiff-Appellant Malcolm Wiener appeals from a judgment of the United States District Court for the Southern District of New York (Ramos, *J.*) dismissing his claims against Defendants-Appellees AXA Equitable Life Insurance Company ("AXA") and insurance agent David Hungerford. Wiener principally alleges the Defendants caused him to miss a payment that would have kept his life insurance policies in force (the "Termination Claims"). He also alleges that AXA wrongfully denied his application to reinstate the policies (the "Reinstatement Claim").

We conclude that the district court properly awarded summary judgment to all defendants on the Termination Claims. Even if AXA breached a contractual duty when it failed to send Wiener a premium notice after his policies lapsed, on this record, no factfinder could conclude that the breach caused Wiener's failure to cure the lapse. Moreover, Wiener waived any objection to AXA's changing the address associated with his policies by acquiescing in the change, after receiving notice, for almost five years. And Wiener's claim that Hungerford breached his obligation to contact Wiener to tell him that his policy had lapsed fails because Hungerford had no such duty. With respect to the Reinstatement Claim, there is a genuine issue of material fact as to the *actual* reasons underlying AXA's denial, and whether those reasons were arbitrary.

For these reasons and others set forth herein, we **AFFIRM** the district court's summary judgment for Defendants on the Termination Claims and **VACATE** the district court's entry of summary judgment for AXA on Wiener's Reinstatement Claim.

―――――――

DAVID G. WEBBERT, Johnson & Webbert, LLP, Topsham, ME (Theresa Guertin & Kristen Alexandra M. O'Neill, Saxe Doernberger & Vita, P.C., Trumbull, CT; Lawrence F. Reilly, The Reilly Law Firm, LLC, Ridgefield, CT; Carolyn Talbot Seely, Greenwich, CT, *on the brief*), *for Plaintiff-Appellant*.

ANDREW B. DAVIS, Lehotsky Keller LLP, Austin, TX (Leah F. Bower, Lehotsky Keller, LLP, Austin, TX; Steven P. Lehotsky, Lehotsky Keller LLP, Washington, DC, *on the brief*), *for Defendants-Appellees AXA Equitable Life Insurance Company, AXA Advisors LLC, and AXA Network LLC.*

BRIAN J. PALMERI, Winget, Spadafora & Schwartzberg, LLP, Stamford, CT (Daniel P. Quinlan, Winget, Spadafora & Schwartzberg, LLP, Stamford, CT, *on the brief*), *for Defendant-Appellee David Hungerford*.

ROBINSON, *Circuit Judge*:

Plaintiff-Appellant Malcolm Wiener appeals from a judgment of the United States District Court for the Southern District of New York (Ramos, *J.*) awarding summary judgment to Defendants-Appellees AXA Equitable Life Insurance Company ("AXA") and insurance agent David Hungerford. Wiener claims AXA and Hungerford (collectively, "Defendants") caused him to miss a critical payment that would have kept his life insurance policies in force ("the Termination Claims").[1] Wiener also alleges that AXA then wrongfully denied his application for reinstatement on arbitrary grounds ("the Reinstatement Claim").

We are primarily called upon to review the district court's entry of summary judgment for Defendants. *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 04019 (ER), 2021 WL 1226925 (S.D.N.Y. March 31, 2021) (*Wiener II*).

---

[1] Wiener also sued two entities related to Defendants, AXA Advisors LLC and AXA Network LLC (collectively, "the AXA LLCs"). Because he does not on appeal challenge the district court's judgment for the AXA LLCs, we largely omit them from our discussion.

We first reject Hungerford's jurisdictional argument that Wiener's appeal is untimely with respect to his challenges to the judgment for Hungerford because we conclude that the appeal clock didn't start running until after the district court denied Wiener's post-judgment motion under Federal Rule of Civil Procedure 59.

On the merits, having reviewed the summary judgment record without deference to the district court, *Williams v. New York City Housing Authority*, 61 F.4th 55, 68 (2d Cir. 2023), we conclude that the court did not err in awarding Defendants summary judgment on the Termination Claims, but that material issues of disputed fact preclude summary judgment in AXA's favor on the Reinstatement Claim. Although AXA identifies grounds to deny Wiener reinstatement that may fall within its reasonable discretion, there is a genuine factual dispute concerning its *actual* reason for declining to reinstate Wiener's policy, and whether *that* reason was arbitrary. Thus, AXA was not entitled to summary judgment on the Reinstatement Claim. Moreover, we conclude that the district court erred in part when it excluded testimony from Wiener's doctors regarding factual matters, although it did not exceed its discretion in precluding Wiener's experts from testifying about underwriting matters.

We thus **AFFIRM** the district court's judgment for Defendants on the Termination Claims, **VACATE** the grant of summary judgment to AXA on

Wiener's Reinstatement Claim, and **REMAND** for further proceedings consistent

with this opinion.

**BACKGROUND**

## I.  The Facts[2]

### A.  The Parties and the Policies

Malcolm Wiener is a historian, lawyer, and the retired founder of Millburn

Corporation ("Millburn"), a financial services firm based in New York City.  In

1986, around the time Wiener retired from Millburn, he purchased three life

insurance policies (the "Policies") from AXA.  Four years later, David Hungerford

became the Policies' designated agent.  Hungerford worked for AXA and related

entities.

The Policies are known as "flexible" or "universal" life insurance policies.

App'x 848–50, 854, 4085.[3]  To maintain them, Wiener was not required to pay a

predefined premium amount on a regular schedule.  Instead, he could skip

planned premium payments or change their frequency and amount, as long as he

---

[2] Unless otherwise noted, our factual recitation is drawn from the summary judgment record, and we resolve disputed facts and draw all reasonable inferences in Wiener's favor.  *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024).

[3] When quoting the summary judgment evidence, the parties' briefs, and caselaw, we omit all internal quotation marks, alterations, footnotes, ellipses, and citations, unless otherwise noted.

maintained enough funds in each Policy Account to cover his monthly deductions for the cost of insurance and other fees. If the Policy Account had insufficient funds to cover these deductions, Wiener would be given a 61-day grace period to pay a sufficient amount to cover three months of monthly deductions. The parties refer to this event as a "lapse." *Id.* at 4086. If Wiener failed to pay the required sum within the grace period, the Policies would "end[] without value." *Id.* at 903, 931, 959. The parties refer to this as "terminat[ion]." *Id.* at 4087.

Termination did not necessarily mean that all was lost. The Policies allowed Wiener to seek reinstatement within three years if he provided "evidence of insurability satisfactory" to AXA and made a premium payment sufficient to keep the policy in force for at least three months after the date of reinstatement. *Id.* at 903, 931, 959.

Two notice provisions are relevant to this appeal: "premium reminder notice" provisions and "lapse notice" provisions.

Under the premium reminder notice provisions, AXA agreed to send Wiener written reminders to pay his planned periodic premiums, which were scheduled "semiannually." *Id.* at 895, 923, 950. The Policies did not spell out a precise schedule for sending the notices and did not set a payment deadline. In practice, AXA—with Hungerford copied—primarily sent Wiener premium

6

reminder notices about 21 to 23 days before May 1 and November 1 of every year. The notices generally set a payment due date of May 1 and November 1. It appears AXA adopted this scheduling based on the Policies' register date of November 1.

But recall that Wiener purchased *flexible* life insurance policies. Wiener was not required to make any payments in response to a premium notice, though tendering the recommended premium would help ensure his Policies maintained an adequate balance to cover monthly insurance costs and other fees. The Policies themselves said that Wiener could skip premium payments, change their frequency, and alter their amount. The premium notices therefore had an advisory quality.

The lapse notices were an entirely different matter. Under the lapse notice provisions, AXA had to tell Wiener when the Policies lapsed, when the grace period would expire, and how much he must pay to save them from termination, lest he and his wife (the Policies' beneficiary) risk losing coverage completely.

*B. Wiener's Payment Practices and Lapse History*

When Wiener bought the Policies in 1986, he was 51 years old. Rather than managing the Policies himself, Wiener chose to delegate this responsibility to Millburn (the company he founded and retired from), which would review any notices from AXA and make necessary payments. So, when Wiener applied for

7

the Policies, he initially listed Millburn's offices in Miami, Florida, as the applicable mailing address, even though he lived in Connecticut. At some point, likely around 1994, Wiener changed the mailing address associated with the Policies to Millburn's offices in New York, and individuals at that office subsequently maintained the Policies on Wiener's behalf.

Wiener, or the Millburn employees in New York acting on his behalf, adopted a practice of not paying *any* semiannual premiums—even after receiving premium notices from AXA. Only when Wiener received a lapse notice would Millburn tender payment. Even then, the payments would barely bring Wiener's accounts into good standing. Hungerford noticed this high-risk pattern, and in 2005 he faxed a memo to a Millburn executive to express concern about the practice. Hungerford's memo recommended that Millburn pay more than the minimum required to cure a lapse, so as to avoid a lapse every three months. Wiener and his agents at Millburn did not heed this advice.

AXA's records show that from 1994 to 2013, each Policy lapsed three to four times a year for a total of 209 times. On at least three occasions—in 1999, 2007, and 2008—Millburn failed to cure the lapse and AXA terminated the Policies. When Wiener applied for reinstatement on these occasions, AXA approved his applications.

*C. Address Change*

Although Wiener listed Millburn's New York offices as the Policies' designated mailing address, in March 2009, AXA changed the address to Wiener's residence in Connecticut and provided written notice of the change to both the New York and Connecticut addresses. Wiener did not authorize this change. He surmises that Hungerford erroneously altered the record address for the Policies when Hungerford handled another insurance matter—a joint survivorship policy—for which his wife's assistant had requested that any related documents be sent to the Connecticut address.

Despite the unauthorized address change, personnel at Millburn continued to receive Policy-related notices. For more than four years—from March 2009 (when the address change occurred) to December 2013 (when the Policies were most recently terminated)—Wiener's household staff in Connecticut would sort his incoming mail in his home office or at the kitchen table. Whenever the staff encountered Policy-related correspondence, they would forward it to Millburn's New York offices. Individuals at Millburn would then follow their usual course and either take no action (if it was a premium notice) or tender payment (if it was a lapse notice). Wiener's household staff did not maintain logs for mail received

or processed. Nor did they make copies of mail or envelopes received and forwarded to Millburn in New York.

### D. 2013 Termination of the Policies

Ultimately, Wiener's high-risk approach backfired. On October 1, 2013, the Policies lapsed yet again, triggering a 61-day grace period. Consistent with its typical practice, AXA did not send Wiener *premium* notices once the Policies had lapsed.

As for the corresponding lapse notices (the "2013 lapse notices"), the parties disputed whether AXA sent them. A senior director at AXA testified that the company's system autogenerated the 2013 lapse notices, and he produced internal copies of them. He also searched and found no record of the United States Postal Service returning the 2013 lapse notices as undeliverable. A representative from AXA's vendor, which handled mailing logistics, likewise testified that three pieces of AXA-related mail were sent to Wiener's Connecticut address around the same time as the lapse, with the postage paid.

On the other hand, Wiener, his wife, household staff, and the Millburn employees have no record or recollection of ever receiving the 2013 lapse notices.

10

Because Wiener did not tender payment by December 1, 2013 (the end of the grace period), AXA terminated the Policies. The termination led to a $16 million loss in potential death benefits.

### E. Wiener's Reinstatement Application

After receiving notice that his Policies were terminated, Wiener applied for reinstatement. AXA declined his request.

The reinstatement application required Wiener to answer AXA's standard questions, such as whether he had suffered a stroke in the past five years and whether he had been disabled for two weeks or more in the last two years. Wiener also had to grant the company permission to contact his doctors for medical records or professional opinions.

Hallie Hodgins, one of AXA's senior underwriters, reviewed Wiener's reinstatement application. She got copies of Wiener's medical records and took notes on health conditions that could impact her underwriting analysis and ultimate decision.

At one point, Dr. Barry Boyd, Wiener's treating physician since 1988, called and offered to help construe Wiener's medical records, so as to avoid any misinterpretation. Internal emails show that two AXA employees—a senior director and a lead associate—directed Hodgins to call Dr. Boyd back. She did not

11

do so.  Instead, less than twenty-four hours after receiving multiple requests to contact Dr. Boyd, Hodgins told a colleague to submit seven diagnosis codes to the Medical Information Bureau ("MIB").[4]  These codes communicated that Wiener had various medical conditions that might be relevant to insurance underwriters. Hodgins also determined Wiener was uninsurable under AXA's underwriting guidelines and denied his application.  According to her notes, four primary reasons justified the denial—three corresponding to codes she had communicated to MIB, and one reflecting another medical concern.[5]  Pursuant to her denial, AXA issued Wiener a rejection letter, which simply said:

> Your request for Reinstatement has been declined.
>
> The decision results from our evaluation of specific items of information obtained from you in your application, or supplements to the application statements:
>
> - specifically information received from Dr[.] Barry Boyd. . . .

App'x 1315 (emphasis in original removed).

---

[4] In a related lawsuit, the Fourth Circuit has described the MIB as follows: "The MIB is a consortium of about 400 companies, which write about 90–95% of the individual life insurance policies in the United States.  When an MIB member reviews an applicant's medical records, it reports any medical conditions that might be relevant to a later underwriter in the form of standardized six-character codes." *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 778 (4th Cir. 2023).

[5] Because we need not detail the specifics of Wiener's medical records and Hodgins's assessment of them to explain our reasoning, and in recognition of Wiener's privacy interests, we describe Wiener's medical conditions, and those ascribed to him, in deliberately general terms.

As Wiener correctly points out (and will be of great import later), the seven MIB codes, Hodgins's contemporaneous notes, and the denial letter never mention low levels of serum albumin, a protein that's synthesized by the liver and accounts for 50% of the protein content in blood.

References to serum albumin first surfaced in Hodgins's deposition, which took place over two sessions scheduled two months apart. During her first deposition session, Hodgins deciphered her notes and walked Wiener's attorney through AXA's underwriting guidelines. She supplied the following explanation of her underwriting analysis. When Hodgins reviews an applicant's medical records, she identifies relevant medical impairments or risk factors and assigns them "debits." App'x 4357. For example, a diabetic applicant with a certain hemoglobin A1C level will receive 50 debits. A risk factor like smoking will also generate debits. Once Hodgins adds the debits up, she takes the applicant's score and assigns the applicant a "table rating." *Id.* The higher the table rating, the higher the risk of mortality. From there, Hodgins compares the table rating against AXA's catalog of insurance products and determines which ones the applicant qualifies for, if any, and at what premium rates.

In Wiener's case, he could not be reinstated if his debits caused him to move two table ratings from where he was when the Policies originally issued. (Recall

13

that he bought the Policies at age 51 and applied for reinstatement at age 78). Hodgins testified that six factors created enough debits to deny Wiener reinstatement. Hodgins's explanation was consistent with her contemporaneous notes. Though she did not mention low serum albumin levels in this list of six reasons, Hodgins stated that Wiener's low serum albumin levels also factored into her decision. During the second session, she said more definitively, "The reason we declined Mr. Wiener's request for reinstatement was because of the serum [albumin]." *Id.* at 4651. When asked for clarification, Hodgins stressed that serum albumin drove her decision to deny reinstatement, though other considerations also contributed to the adverse decision.

Viewed in the light most favorable to Wiener, Hodgins's testimony raised a number of issues concerning her grounds for denying Wiener's application. For one thing, Wiener's testimony about his medical history flatly contradicted one of the bases on which Hodgins had assigned a debit in her assessment, raising the possibility that Hodgins had given Wiener debits based on an inaccurate assessment of his medical history.

Moreover, viewing the record in the light most favorable to Wiener, Hodgins's purported reliance on his serum albumin levels was at odds with AXA's own guidelines. Under AXA's "Senior Applicant Medical Checklist" for

14

applicants aged 70 and older, certain medical factors carried more weight than they otherwise would. *Id.* at 1899. For example, if an applicant 70 or older recently had a fall and suffered from anemia, the checklist required Hodgins to consult a medical director. Most relevant here, if a recent blood test reported serum albumin levels of 3.8 or lower, the checklist said, "usually [d]ecline." *Id.* By the guidelines' terms, a low serum albumin reading created a *presumption* of declination—they did not mandate one. Hodgins testified that even with a serum albumin reading of 3.8 or lower, she was required to conduct an "overall review of the file" before denying reinstatement. *Id.* at 4371. She also testified that she never consulted a medical director about her analysis.

In addition, Hodgins admitted that she could not read portions of Wiener's medical records, and she never called Dr. Boyd to clarify any of the illegible segments. When she was asked on the second day of her deposition why she never called Dr. Boyd, Hodgins said the call would have violated Wiener's rights under the Health Insurance Portability and Accountability Act ("HIPAA"). But two months earlier, she testified that she *could* call a treating physician and get a letter of clarification if she could not understand a document. Further, by signing AXA's reinstatement paperwork, Wiener *expressly waived* his privacy rights and authorized Hodgins to contact Dr. Boyd. And, as noted above, two senior-level

colleagues *told* Hodgins to call Dr. Boyd. These portions of the record contradicted Hodgins's testimony that she could not lawfully contact Dr. Boyd.

Viewing the record in the light most favorable to Wiener, had she done so, she would have learned that Wiener's doctors considered him to be in good health and that some of her debits weren't supported by the medical record. For example, an office note expressly contradicted Hodgins's conclusion that Wiener suffered from one of the conditions for which he was debited, and the medical records as a whole did not support her imposition of a different debit. Dr. Boyd's testimony called into question the basis for some of Hodgins's other debits. In short, some evidence suggests that Hodgins wrongfully assigned Wiener debits for health conditions that he did not have, and that she declined an opportunity to clarify these points with Wiener's doctor.

## II. District Court Proceedings

After AXA denied reinstatement, Wiener filed this lawsuit.[6] As relevant to this appeal, he seeks reinstatement on the basis that the termination of his Policies resulted from AXA's and Hungerford's breaches of various duties (the

---

[6] Wiener initially filed suit in Connecticut state court, and AXA removed the case to the District of Connecticut. The parties then filed a joint motion to transfer the case to the Southern District of New York, which the District of Connecticut granted.

Termination Claims). In particular, he alleges that AXA breached its promise under the insurance contract by failing to send him premium notices on November 1, 2013, and that it committed a fraudulent misrepresentation in its insurance agreement by stating it would do so. Wiener avers that if AXA had sent premium notices in November 2013 after the Policies lapsed, he would have been prompted to pay the balance necessary to keep them in force. He further alleges that AXA breached its obligations under the Policies by sending the October 2013 lapse notices to his home address in Connecticut rather than the Millburn office in New York City. With respect to Hungerford, Wiener alleges that Hungerford was negligent and breached his fiduciary duties by failing to properly advise Wiener and protect him against the Policies' termination.

With respect to AXA's denial of his reinstatement applications, Wiener asserts that AXA breached the covenant of good faith and fair dealing.

The district court awarded Defendants summary judgment on all of these claims. The court rejected Wiener's claim that AXA breached the insurance contracts by failing to send November 1, 2013 premium reminder notices on two grounds. First, parsing the policy language and applying both New York and Connecticut law, the court concluded that AXA was not actually obligated to send premium reminder notices to Wiener on November 1, and thus did not breach any

duty. *Wiener II*, 2021 WL 1226925, at *7–8. Second, the court concluded that even if AXA was required to mail Wiener premium reminder notices on November 1, "the evidence conclusively shows that Wiener did not suffer damages as a result of the breach." *Id.* at *9. Wiener's claim that AXA fraudulently misrepresented that it would send premium reminder notices on November 1 failed for similar reasons. *Id.*

The district court likewise rejected Wiener's claim that AXA breached its agreement with him by changing the address of record to his Connecticut home without his authorization, leading to his failure to bring the Policies back into good standing after AXA sent the lapse notices. Applying New York law, the court concluded that Wiener's receipt of notice of the change of address at *both* addresses, failure to object to that change, and remittance of payment a total of eighteen times over several years in response to lapse notices sent to his Connecticut address amounted to a waiver of his right to challenge the change of address. *Id.* at *12.

The court also awarded Hungerford summary judgment, rejecting Wiener's three contentions that Hungerford was liable for negligence and breaching his fiduciary duties because (1) he changed the record address associated with the Policies without Wiener's consent, (2) he didn't personally notify Wiener after his

18

Policies lapsed in October 2013, and (3) he failed to advise Wiener on how to pay premiums to prevent the Policies' termination. *Id.* at *15–17. Applying New York law, the Court concluded that there was no evidence to suggest that Wiener would have made the necessary payments if Hungerford had reminded him. *Id.* at *17. Wiener relied on Millburn, not Hungerford, to keep his insurance policies active, and neither Wiener nor anyone at Millburn ever spoke to Hungerford about how to properly manage the Policies. *Id.*[7]

Before ruling on AXA's summary judgment motion with respect to the Reinstatement claim, the court granted AXA's motion to preclude the expert testimony and reports of two physicians—Dr. Boyd and Dr. Ben-Yehuda—who would have testified that Wiener was medically qualified for reinstatement. *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 04019 (ER), 2019 WL 1228074 (S.D.N.Y. March 15, 2019) (*Wiener I*). The court concluded that the testimony

---

[7] The district court also rejected Wiener's claim that AXA altogether failed to send the lapse notices. Applying New York law and considering the summary judgment record, the district court concluded that AXA was entitled to a legal presumption that Wiener received the lapse notices, and that Wiener had failed to rebut it. *Wiener II*, 2021 WL 1226925, at *13. Wiener does not challenge this conclusion on appeal. Nor does he challenge the district court's entry of summary judgment on his claims against AXA for declaratory and injunctive relief, contractual waiver, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"). He also does not challenge the court's award of summary judgment to the AXA LLCs on his claims of negligence, breach of the fiduciary duty, and violations of CUTPA. We deem these claims abandoned and thus affirm the district court's judgment on these claims. *See Tafolla v. Heilig*, 80 F.4th 111, 115 (2d Cir. 2023).

would be irrelevant because the question before the court was not whether Wiener was healthy; it was whether AXA acted arbitrarily and capriciously by applying certain underwriting guidelines to determine he was uninsurable. *Id.* at *6. Accepting AXA's assertion that it declined Wiener's request for reinstatement due to his serum albumin levels, the district court concluded that the pivotal question was whether AXA "reasonably relied on Wiener's albumin level to determine whether he was insurable." *Id.* The answer to this question required an assessment of life insurance underwriting guidelines, not Wiener's state of health. *Id.* Because neither doctor was qualified to testify about the reasonableness of AXA's insurance underwriting guidelines with respect to serum albumin levels in an applicant over the age of 70, the district court concluded their testimony was not relevant to the question of insurability, and they could not testify as experts. *Id.*

On the merits of the Reinstatement Claim, the court again explained that the dispositive question was whether AXA acted arbitrarily and capriciously by applying certain underwriting guidelines in concluding that Wiener wasn't insurable. *Wiener II*, 2021 WL 1226925, at *20. Again, the court accepted the premise that AXA declined reinstatement because of Wiener's serum albumin levels and concluded that Wiener had not produced any admissible evidence to

challenge the reasonableness of AXA's reliance on that factor. *Id.* The court rejected the suggestion that there was a bona fide dispute about the actual reason for AXA's denial. *Id.*

After the district court denied his Rule 59 motion to alter or amend the summary judgment decision, *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 04019 (ER), 2022 WL 950979 (S.D.N.Y. Mar. 29, 2022), Wiener appealed. Hungerford contends that Wiener's appeal is untimely insofar as he seeks to vacate the district court's judgment for Hungerford.

## DISCUSSION

We consider in turn (1) Hungerford's challenge to our appellate jurisdiction; (2) Wiener's challenges to the district court's rulings on the Termination Claims; (3) Wiener's challenge to the district court's award of summary judgment to AXA on the Reinstatement Claim; and (4) the district court's evidentiary rulings in connection with the Reinstatement Claim.

21

## I. Appellate Jurisdiction[8]

Hungerford argues that we lack jurisdiction to hear this appeal because Wiener's notice of appeal was untimely as to the claims against Hungerford. We disagree.

Under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A), civil litigants generally must file a notice of appeal within 30 days after the entry of final judgment. A failure to do so divests us of appellate jurisdiction, and there is no equitable exception to this 30-day rule. *See Amara v. Cigna Corporation*, 53 F.4th 241, 247 n.3 (2d Cir. 2022). However, where a litigant files a timely, qualifying post-judgment motion, including a motion for a new trial or to alter or amend a judgment under Federal Rule of Civil Procedure 59, "the time to

---

[8] Because Wiener's complaint did not allege the citizenship of the AXA LLCs' members, it left some question as to whether the federal courts have diversity jurisdiction in this case. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42, 49 (2d Cir. 2012) (limited liability companies take on the citizenship of each of their members); *Platinum-Montaur Life Sciences, LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 615, 618–19 (2d Cir. 2019) (holding district court was obligated to determine the citizenship of 220 limited partners, even if it was cumbersome, or remand the matter to state court for failure to establish complete diversity). At this Court's request, Wiener clarified that there is a single member in each AXA LLC—a Delaware corporation with its principal place of business in New York. We accordingly deem the pleadings amended pursuant to 28 U.S.C. § 1653 and conclude that Wiener has alleged sufficient facts to support diversity jurisdiction. *See also Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 103 (2d Cir. 1997) ("A failure to allege facts establishing jurisdiction need not prove fatal to a complaint. [Under 28 U.S.C. § 1653], defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.").

file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(A).

Here, Wiener filed a timely Rule 59(e) motion to alter or amend the district court's judgment. Observing that Wiener's post-judgment arguments only challenged the award of summary judgment to AXA and its related entities, Hungerford argues that Wiener's deadline to file a notice of appeal only paused the time to file an appeal *concerning those defendants*. In Hungerford's view, the 30-day clock continued to run with respect to the judgment in favor of Hungerford, so Wiener's appeal of that judgment, filed after the district court denied Wiener's Rule 59(e) motion and more than a year after the district court entered its final judgment, was untimely.

Hungerford's position is incompatible with Rule 4(a)(4)(A)'s text. The Rule plainly says that a timely Rule 59(e) motion defers the start of the appeal clock "for *all* parties." Fed. R. App. P. 4(a)(4)(A) (emphasis added). A notice of appeal challenging a judgment as to any party is thus timely if it's filed within 30 days after the district court rules on the last qualifying post-judgment motion. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1279 (10th Cir. 2013) (rejecting nearly identical argument); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 685 n.3 (2d Cir. 1983) (holding plaintiff's cross-notice of appeal filed more than a year after entry of final

23

judgment timely because defendants' post-judgment motions tolled the appeals window for all parties). We therefore reject Hungerford's challenge to our exercise of appellate jurisdiction.

## II. The Termination Claims

For the reasons set forth below, we affirm the district court's judgment and denial of reconsideration concerning Wiener's Termination Claims. We consider the breach of contract and fraudulent misrepresentation claims against AXA, and the negligence and breach of fiduciary duty claims against Hungerford, respectively.

### A. Claims against AXA

On appeal, Wiener argues that (1) AXA's failure to send premium notice reminders on November 1, 2013 was a breach of its obligations and reflected a fraudulent misrepresentation, and (2) AXA breached the insurance contracts by sending the 2013 lapse notices to the Connecticut address and not Millburn's New York address. We conclude no reasonable juror could render a verdict for Wiener on either basis.

#### 1. AXA's Failure to Send November 1, 2013 Premium Notices

Wiener avers that because his recommended premiums under the Policies were "payable semiannually," the provision requiring AXA to send premium

24

reminder notices obligated it to send notices in six-month intervals, on May 1 and November 1. If AXA had sent premium reminder notices on November 1, 2013, after the Policies had lapsed, Wiener claims he would have paid the outstanding balance to cure the lapse.

AXA disagrees. Because the Policies do not list precise dates on which premium notices must be sent, AXA suggests that "semiannually" must mean "twice a year," which it interprets as "*roughly* once every six months." AXA Br. at 38 (emphasis added). Moreover, AXA contends it isn't required to send *premium* notices once a Policy lapses. Accordingly, AXA argues, it did not commit any breach by failing to send November 1, 2013 premium notices. AXA also argues that even if it did breach a contractual obligation, there is no evidence that such a breach caused the Policies to terminate.

We agree with AXA. We need not decide whether AXA was contractually obligated to send November 1, 2013 premium notices because Wiener cannot show that any claimed breach caused the termination of his Policies.

To prevail on a claim for breach of contract under New York law, a plaintiff must show "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Because causation "is an essential element of damages

in a breach of contract action," "[d]amages for breach of contract must be such only as actually follow or may follow from the breach of the contract." *National Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004). That is, a defendant who breaches a contract is only liable for direct and proximate damages flowing from the breach. *Id.*[9]

Even if AXA's failure to send premium notices on or around November 1, 2013 amounted to a breach, on this record, no reasonable factfinder could find that the breach caused Wiener to suffer damages. The undisputed evidence shows that from 1994 to 2013 (19 years), Millburn employees in New York never tendered payment in response to premium notices. Millburn's tax director, who handled Policy-related correspondence for years and was responsible for authorizing payments, testified as much. A senior director at AXA who reviewed the Policies' history confirmed that premium notices never prompted payment.

This evidence clearly shows that even if AXA had sent a 2013 premium notice, it would have made no difference. Wiener, through Millburn, *never* relied

---

[9] We cite New York contract law because the parties' briefs assume that New York law applies and because neither party challenges the district court's choice-of-law conclusion that, for purposes of the premium notices claim, there is no conflict between New York and Connecticut law. *See Alphonse Hotel Corporation v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016); *Wiener II*, 2021 WL 1226925 at *6–7.

on a premium notice to prompt a payment. For that reason, he cannot show causation and damages.

For similar reasons, even if we concluded that the Policies' language regarding premium notices constituted a fraudulent statement, we would affirm the district court's summary judgment for AXA on Wiener's fraudulent misrepresentation claim. Wiener cannot show reliance—a critical element under New York law. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011). On this record, no reasonable jury could find that Wiener, through Millburn and his household staff, relied on AXA's asserted promise to send premium notices. The district court properly granted AXA summary judgment on these claims.

## 2. Delivery to the "Wrong" Mailing Address

Wiener also alleges that AXA breached the Policies by mailing lapse notices to Connecticut. He stresses that he never authorized the address change. Because we must resolve factual disputes in Wiener's favor, we accept that AXA, through Hungerford, changed the mailing address for the Policies without Wiener's authorization. But on this record, we conclude that Wiener waived any challenge to the change of address.

In New York, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v.*

27

*Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006); *see also Bosoian v. Hubbard*, 121 A.D. 510, 512 (2d Dep't 1907) ("The waiver of a provision of a contract is in effect a modification of it . . . .").[10] "Such abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundamental Portfolio Advisors*, 7 N.Y.3d at 104. Still, waiver "should not be lightly presumed" and must be established through "a clear manifestation of intent." *Id.* And where a party has waived a contractual right, if that party wishes to withdraw its waiver, it must give notice of the withdrawal and a reasonable time after that notice within which the non-waiving party can perform. *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982).

Assuming AXA breached its duty by changing Wiener's mailing address, there is no genuine dispute that Wiener waived any claim arising from that breach. In 2009, AXA sent written notice of the address change to both Millburn's New York office and Wiener's Connecticut residence. The notices contained at least one Policy number on them. For nearly five years after that, Wiener's household staff in Connecticut knew that AXA sent Policy-related mail to Connecticut. Instead of

---

[10] Neither party challenges the district court's application of New York law to this challenge, and the parties cite New York law in their briefs, so we again follow suit.

directing AXA to undo the address change, Wiener, through his staff, simply adapted and rerouted the mail to Millburn's offices in New York.

By choosing to accept mail in Connecticut without objection for years—after receiving written notice of the address change in both New York and Connecticut—Wiener waived any challenge to the address change; and he never withdrew this waiver. We reject Wiener's argument that he, personally, was unaware of the circumstances surrounding these mailings. The above acts by Millburn and Wiener's staff are attributable to Wiener himself for purposes of the waiver analysis, so AXA is entitled to summary judgment on this claim. *See Poucher v. Blanchard*, 86 N.Y. 256, 260 (1881) ("[I]t is elementary law that the principal is bound by the acts of [the] agent performed within the scope of [the agent's] authority[.]"); *Kingsland Group, Inc. v. J.B. Satcin Realty Corp.*, 16 A.D.3d 380, 381–82 (2d Dep't 2005) ("[A]n agent may be appointed to do the same acts and achieve the same legal consequences as if the principal had . . . personally acted[.]").

### B. Claims Against Hungerford

Wiener alleges Hungerford breached a duty to Wiener by (1) failing to alert Wiener when his Policies lapsed in October 2013, and (2) changing the address of

29

record on Wiener's Policies without Wiener's authorization. Hungerford is entitled to summary judgment on both claims.

### 1. Failure to Alert

After AXA sent the lapse notices to Wiener, Hungerford had no duty to independently notify Wiener of his Policies' lapse. Under New York law, "an insurance agent has a common-law duty to obtain requested coverage, but generally not a continuing duty to advise, guide or direct a client based on a special relationship of trust and confidence." *Chase Scientific Research v. NIA Group*, 96 N.Y.2d 20, 30 (2001).[11] New York courts have identified three situations in which an insurance agent may have additional duties beyond those imposed at common law: "(1) the agent receives compensation for consultation apart from payment of the premiums, (2) there was some interaction regarding a question of coverage, with the insured relying on the expertise of the agent; or (3) there is a course of dealing over an extended period of time which would have put objectively reasonable insurance agents on notice that their advice was being sought and specially relied on." *Voss v. Netherlands Ins. Co.*, 22 N.Y.3d 728, 735 (2014).

---

[11] On appeal, Wiener does not challenge the district court's conclusion that New York law governs these tort claims.

30

Wiener has not marshaled evidence to establish that Hungerford had duties beyond those applicable at common law. There is no dispute that from 1990 to 2013 (when Hungerford served as the agent of record on the Policies), Wiener never met Hungerford, never called him, and never communicated with him via mail about the Policies. Nor did Wiener seek Hungerford's advice about how to financially manage the Policies. In his deposition, Hungerford testified that he has 39 years of experience providing financial services and selling life insurance policies, and that he does not speak with clients about missed premium payments. Nor does he contact any clients to ensure that policies remain in force.

Wiener's best evidence suggesting Hungerford owed additional duties is a memo from 2005. In that document, sent eight years before the 2013 termination, Hungerford told a Millburn executive that he had concerns about the company's high-risk payment practices on Wiener's behalf. But this single communication in 2005 does not establish "a course of dealing over an extended period of time," *Voss*, 22 N.Y.3d at 735, let alone one in which a reasonable insurance agent would have known that Wiener sought the agent's warnings of a policy's lapse. *See Holskin v. Hurwitz*, 211 A.D. 731, 732–33 (1st Dep't 1925) (holding that, absent any additional communications, no additional duty arose to advise insured of a policy's

expiration date, tell insured that the policy expired at a particular time, or to try and help the insured keep the policy alive).

### 2. Change of Address

Likewise, we share the district court's view that even if Hungerford was negligent or breached a fiduciary duty when he changed the address of record for the Policies without Wiener's consent, that conduct did not cause the Policies' termination. As the district court explained, Wiener never protested the address change, and he remitted payment eighteen times in response to lapse notices mailed to him after the address was changed. *Wiener II*, 2021 WL 1226925 at *17. Moreover, AXA sent the lapse notices, and under New York law, Wiener is presumed to have received them. *Id.* In the face of this evidence, we cannot conclude that when Hungerford changed the record address, he proximately caused the Policies' termination.

In sum, we affirm the district court's entry of summary judgment for Defendants on Wiener's Termination Claims and its denial of Wiener's Rule 59(e) motion for reconsideration.

### III.     The Reinstatement Claim

We have a different view of the Reinstatement Claim.

*A. The Parties' Arguments*

On appeal, the parties agree that under New York law, an insurance company cannot deny reinstatement in an arbitrary and capricious manner. *See Miesell v. Globe Mut. Life Ins. Co.*, 76 N.Y. 115, 119 (1879) (insurer cannot "capriciously" reject a health certificate); *Thompson v. Postal Life Ins. Co.*, 226 N.Y. 363, 367 (1919) (insurer cannot deny reinstatement based on "taste or fancy or caprice"); *Kallman v. Equitable Life Assur. Soc'y of U.S.*, 248 A.D. 146, 149 (1st Dep't 1936) (insurer may not "arbitrarily determine" that evidence is unsatisfactory), *aff'd*, 272 N.Y. 648 (1936); *Miller v. Continental Cas. Co.*, 261 A.D. 395, 397 (1st Dep't 1941) (insurer must have "some sound and valid reason for finding [an applicant] no longer insurable"), *aff'd*, 287 N.Y. 643 (1941).

They part ways as to whether, viewing the record in the light most favorable to Wiener, AXA's denial of reinstatement was arbitrary. AXA stresses that insurance companies should be afforded significant deference when it comes to reinstatement denials, contending that an administrator's conclusion should be upheld unless "the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim based upon the evidence cited by the

administrator." AXA's Br. at 58. In AXA's view, it was not arbitrary and capricious to rely on its guidelines requiring underwriters to "usually decline" to reinstate applicants over the age of 70 with low serum albumin levels.

Wiener rejects the premise of this argument; he contends that whether AXA denied him reinstatement based on certain reports of low serum albumin levels is itself a disputed question, and the district court erred by accepting AXA's representation that its declination was based on Wiener's serum albumin levels. In Wiener's view, AXA pretextually invoked his serum albumin levels after the fact, and its *actual* reasons for denying him coverage bear many of the hallmarks of an arbitrary and capricious decision: AXA's decisionmaker refused to communicate details about her reasoning, applied inconsistent reasoning, engaged in deceptive communications, mischaracterized the evidence, and the evidence contradicted her conclusion. Because a reasonable jury could conclude that AXA's underwriter, Hodgins, did not in fact rely on his serum albumin levels, and that the actual basis for denying reinstatement was arbitrary, AXA is not entitled to summary judgment.

### B. *Genuine Disputes of Material Fact Exist*

Our analysis of the parties' arguments is informed by applicable New York law concerning arbitrary and capricious reinstatement denials. Applying that law

34

in light of the familiar summary judgment standard, we conclude that genuine disputes of material fact as to what was the *actual* basis for AXA's denial of reinstatement, and whether it was arbitrary, preclude summary judgment for AXA on the Reinstatement Claim.

As noted above, the parties agree that an insurer cannot exercise its discretion to deny an application for reinstatement of a life insurance policy on grounds that are arbitrary or capricious. *See Thompson*, 226 N.Y. at 367. A variety of considerations bear on whether a denial meets this standard.

First, the denial must be supported by reasons. In *Thompson*, the reinstatement applicant, Thompson, filled out a form, and a doctor designated by the insurance company medically examined him. 226 N.Y. at 366. Even though Thompson was in excellent health, the insurance company rejected Thompson's application, and its letter gave "no suggestion of a reason." *Id.* In a communication preceding the lawsuit, the insurer apparently said it denied reinstatement because "the medical report was unsatisfactory." *Id.* At trial, the insurer's doctor testified that he denied reinstatement merely as an "exercise of his discretion and knowledge." *Id.* at 367. He otherwise provided no elaboration. *Id.*

On this record, the trial court made a factual finding that the reinstatement applicant was in good health and insurable, and concluded that Thompson was

entitled to reinstatement. *Id.* On review from the Appellate Division, the New York Court of Appeals agreed. It rejected the suggestion that where the contract gave discretion to the insurer as to whether to reinstate, it was sufficient for the insurer to simply assert that it found the evidence unsatisfactory. *Id.* The Court of Appeals explained, "The agreement did not contemplate the exercise of the insurer's taste or fancy or caprice . . . That which the law will say a contracting party ought in reason to be satisfied with, that the law will say [the party] is satisfied with." *Id. Thompson* supports the proposition that under New York law, an insurer's denial of reinstatement must be supported by sound reasons.

Similarly, the Appellate Division, First Department, concluded in *Miller* that an underwriter's denial was arbitrary. The underwriter concluded that because the applicant had visited a doctor twice for colds, he likely had "a recurring sinusitis condition." 261 A.D. at 398. The underwriter also noted the applicant had three physical checkups in a year, which, to the underwriter, signaled that "there was something wrong." *Id.* At no point did the underwriter order a physical examination to explore his suspicions further. *Id.* Because the insurer had no legally sufficient reason to support its denial, the court concluded that the insurer could not lawfully deny reinstatement. *Id.* at 398–99. In a brief decision, the New York Court of Appeals affirmed. *See* 287 N.Y. at 644.

While these decisions don't invite a court to second guess a reasonable denial simply because the court may disagree with the insurer's conclusions or because the insurer made minor errors in assessing the application, they do require an insurer who declines to reinstate a life insurance policy on the basis of uninsurability to provide a sound and reasonably investigated basis for doing so.

Here, we have little trouble concluding that there is a genuine dispute over Hodgins's actual reason (or reasons) for denying reinstatement, and whether those reasons were arbitrary.

We begin by noting that AXA's rejection letter was vague. It simply said "information received from Dr[.] Barry Boyd" led to the denial. App'x 1315; *see Thompson*, 226 N.Y. at 366 (critiquing a denial letter for giving "no suggestion of a reason").

And Wiener has raised a legitimate credibility argument as to whether AXA relied on his serum albumin levels in declining his reinstatement application. As Wiener argues, if serum albumin levels were truly outcome-determinative, they would have likely appeared in Hodgins's list of MIB codes and her contemporaneous notes. This evidence could call Hodgins's credibility into question, and the district court erred when in the face of this conflicting evidence it accepted AXA's explanation for its denial. *See Rupp v. Buffalo*, 91 F.4th 623, 634

(2d Cir. 2024) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Moreover, there is a genuine dispute as to whether the actual reasons for AXA's denial were arbitrary. As noted above, some evidence in the record suggests that Hodgins may have relied on purported health conditions that were not fully supported by the medical records and did not in fact exist. For example, although she gave Wiener debits for a condition detectable through blood tests, and one medical record arguably supported this conclusion, another medical record reflected that he actually tested negative for that condition.

So too with the debits she assigned for a purported past medical event. In Hodgins's deposition, she testified that she relied on a single notation in Wiener's 62 pages of medical records in concluding that he had suffered a significant medical event. She conceded that she hadn't seen any reference to this purported event anywhere else in Wiener's medical record. Wiener's attorney argued that an event as significant as the purported event would likely appear more than once in a patient's medical record. A reasonable factfinder could determine that Hodgins acted unreasonably when she assumed Wiener had undergone this significant medical event and chose not to take further steps to confirm her

suspicion.  *See Miller*, 261 A.D. at 398 (noting underwriter failed to take extra steps to confirm suspicion that "there was something wrong").

Because this case presents triable issues of material fact as to the actual basis for denying Wiener's reinstatement application, and whether AXA's conduct and those reasons were arbitrary, the district court erred by awarding AXA summary judgment on Wiener's Reinstatement Claim.

## IV.     Expert Testimony

Our conclusion that there is a genuine dispute as to whether AXA in fact relied on Wiener's serum albumin levels, as opposed to other considerations, has implications for Wiener's challenge to the district court's decision to exclude the expert testimony of Dr. Boyd and Dr. Ben-Yehuda.  Expert testimony is generally admissible if the testimony will help the trier of fact understand evidence or determine a fact issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the testimony reflects a reliable application of those principles and methods.  Fed. R. Evid. 702. We review a district court's decision to disallow proffered expert testimony for abuse of discretion.  *Callahan v. Wilson*, 863 F.3d 144, 153 (2d Cir. 2017); *see also United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("We will not disturb a ruling respecting expert testimony absent a showing of manifest error.").

Recall that the district court excluded these experts primarily because it concluded they were not qualified to address what the district court saw as the pivotal issue in the case: whether AXA's underwriting guidelines concerning serum albumin levels in individuals over 70 were arbitrary. *Wiener I*, 2019 WL 1228074, at *6. Because we reject that premise, and instead conclude that the determination of whether AXA's denial was arbitrary could depend on other considerations altogether, we offer the following guidance for the district court on remand.

First, to the extent the district court concluded that neither Dr. Boyd nor Dr. Ben-Yehuda were qualified to offer an expert opinion on AXA's underwriting guidelines as they relate to serum albumin, we conclude that the district court did not exceed its broad discretion. Both doctors were well-qualified to testify about Wiener's medical condition and the clinical significance of various lab reports and other findings, including the serum albumin levels. But the district court's conclusion that this expertise did not qualify them to opine more broadly on the reasonableness of AXA's serum albumin underwriting guidelines was not manifest error. In fact, the district court noted that Dr. Boyd himself testified that he was qualified to opine about the clinical significance of certain lab values, but not about the reasonable use of those labs for underwriting purposes. *Id.*

Second, we will not address in the first instance whether Wiener's physicians were qualified to evaluate the reasonableness of AXA's reliance on any other factors Hodgins identified as relevant to AXA's underwriting determination. We understand the district court's ruling excluding Dr. Boyd's and Dr. Ben-Yehuda's expert testimony to be narrowly focused on the question of whether AXA's underwriting guidelines relating to serum albumin were reasonable. To the extent Wiener seeks to have these experts testify on other matters—such as Wiener's medical history or the clinical significance of various findings in the record—we leave it to the district court to consider in the first instance any challenges to such evidence.

Third, we don't understand the district court's ruling on the proposed expert testimony to bear on any proffered testimony by Dr. Boyd about *factual* matters, such as his efforts to contact AXA underwriters during their review process or the meaning of his notations in Wiener's medical records. Any proposed factual testimony from Dr. Boyd would flow from his capacity as a lay witness, and as such, this testimony would not be subject to the foundational requirements of Rule 702. *See* Fed. R. Evid. 701 (governing testimony of lay witnesses), 702 (governing testimony of expert witnesses).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's entry of summary judgment for Defendants on the Termination Claims, and we **VACATE** the district court's judgment for AXA on Wiener's Reinstatement Claim. We **REMAND** for further proceedings consistent with this opinion.